# EXHIBIT C

CM-010

| | |
|---|---|
| ᴿ PARTY WITHOUT ATTORNEY *(Nan...  e Bar number, and address):* <br> Yamada (SBN 226669) <br> .GNI, HOLSTEDT, AMICK, MILLER, JOHNSEN&UHRHAMMER <br> Professional Corporation <br> 1912 "I" Street <br> Sacramento, CA, 94814 <br>   TELEPHONE NO. 916-446-4692   FAX NO.: 916-491-4254 <br> ATTORNEY FOR *(Name):* Sugar Workers Union Local No. 1 | FOR COURT USE ONLY <br><br> F I L E D <br><br> MAR 23 2007 <br> K. TOKRE, CLERK OF THE COURT <br> SUPERIOR COURT OF THE STATE OF CALIFORNIA <br> COUNTY OF CONTRA COSTA <br> By      S. HARERECHT, Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Contra Costa
STREET ADDRESS: 725 Court Street
MAILING ADDRESS: 725 Court Street
CITY AND ZIP CODE: Martinez California, 94553
BRANCH NAME: Wakefield Taylor Court House

CASE NAME: Sugar Workers v. C&H

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | | CASE NUMBER: N07-0250 |
|---|---|---|---|---|
| [X] Unlimited <br> (Amount <br> demanded <br> exceeds $25,000) | [ ] Limited <br> (Amount <br> demanded is <br> $25,000 or less) | [ ] Counter    [ ] Joinder <br><br> Filed with first appearance by defendant <br> (Cal. Rules of Court, rule 3.402) | | JUDGE: <br><br> DEPT: |

*Items 1-5 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| [ ] Auto (22) <br> [ ] Uninsured motorist (46) | [ ] Breach of contract/warranty (06) <br> [ ] Collections (09) <br> [ ] Insurance coverage (18) <br> [ ] Other contract (37) | **(Cal. Rules of Court, rules 3.400-3.403)** <br> [ ] Antitrust/Trade regulation (03) <br> [ ] Construction defect (10) <br> [ ] Mass tort (40) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** <br> [ ] Asbestos (04) <br> [ ] Product liability (24) <br> [ ] Medical malpractice (45) <br> [ ] Other PI/PD/WD (23) | **Real Property** <br> [ ] Eminent domain/Inverse <br>     condemnation (14) <br> [ ] Wrongful eviction (33) <br> [ ] Other real property (26) | [ ] Securities litigation (28) <br> [ ] Environmental/Toxic tort (30) <br> [ ] Insurance coverage claims arising from the <br>     above listed provisionally complex case <br>     types (41) |
| **Non-PI/PD/WD (Other) Tort** <br> [ ] Business tort/unfair business practice (07) <br> [ ] Civil rights (08) <br> [ ] Defamation (13) <br> [ ] Fraud (16) <br> [ ] Intellectual property (19) <br> [ ] Professional negligence (25) <br> [ ] Other non-PI/PD/WD tort (35) | **Unlawful Detainer** <br> [ ] Commercial (31) <br> [ ] Residential (32) <br> [ ] Drugs (38) <br> **Judicial Review** <br> [ ] Asset forfeiture (05) <br> [ ] Petition re: arbitration award (11) <br> [ ] Writ of mandate (02) <br> [ ] Other judicial review (39) | **Enforcement of Judgment** <br> [ ] Enforcement of judgment (20) <br> **Miscellaneous Civil Complaint** <br> [ ] RICO (27) <br> [ ] Other complaint *(not specified above)* (42) <br> **Miscellaneous Civil Petition** <br> [ ] Partnership and corporate governance (21) <br> [X] Other petition *(not specified above)* (43) |
| **Employment** <br> [ ] Wrongful termination (36) <br> [ ] Other employment (15) | | |

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties    d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel    e. [ ] Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve        in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision
3. Type of remedies sought *(check all that apply):*
   a. [X] monetary    b. [X] nonmonetary; declaratory or injunctive relief    c. [ ] punitive
4. Number of causes of action *(specify):* One (1)
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March 23, 2007

Will M. Yamada (SBN 226669)
_____       ▶     _____
(TYPE OR PRINT NAME)               (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

| | | |
|---|---|---|
| Form Adopted for Mandatory Use <br> Judicial Council of California <br> CM-010 [Rev. January 1, 2007] | **CIVIL CASE COVER SHEET** <br> Legal Solutions ® Plus | Cal. Rules of Court, rules 3.220, 3.400-3.403; <br> Standards of Judicial Administration, § 19 |

1  WILL M. YAMADA, ESQ. (SBN 226669)
   KATHLEEN N. MASTAGNI, ESQ. (SBN 244298)
2  **MASTAGNI, HOLSTEDT, AMICK,**
   **MILLER, JOHNSEN & UHRHAMMER**
3  *A Professional Corporation*
   1912 I Street
4  Sacramento, California 95814
   Telephone:    (916) 446-4692
5  Facsimile:    (916) 447-4614

6  Attorney for Petitioner,
   Sugar Workers Union Local No. 1

```
F I L E D
```
MAR 2 1 2007

K. TORRE, CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA
By _____
     S. HARBRECHT, Deputy Clerk

8          **SUPERIOR COURT OF CALIFORNIA**

9            **COUNTY OF CONTRA COSTA**

11  SUGAR WORKERS UNION LOCAL NO.  )   No.  **N07 - 0250**
    1,                             )
12                                 )   **NOTICE OF HEARING ON**
              Petitioner,          )   **PETITION TO COMPEL**
13                                 )   **ARBITRATION**
                                   )
14                                 )   [Code of Civil Procedure §§ 1281 et seq.;
    C & H SUGAR COMPANY,           )   29 United States Code § 152, et seq.]
15                                 )
              Respondent.          )   Date: ~~5-11-07~~ June 8, 2007
16                                 )   Time: 8:30
                                   )   Dept: 16
17  _____)   Judge:

19  **TO:  RESPONDENT, C & H SUGAR COMPANY , AND ITS ATTORNEY OF RECORD**

20       You are hereby notified that on *June 8, 2007* ~~at~~ on *8:30* a.m., or as

21  soon as counsel can be heard, in Department *16* of the above-entitled court, located at 725

22  Court Street, Martinez, CA, 94553, a hearing will be conduced on the Petition To Compel

23  Arbitration under the provisions of the written agreement between Petitioner and Respondent.

24       This Motion is made on the grounds that a controversy has arisen out of said agreement

25  and that such controversy now exists and that Respondent has refused, and continues to refuse, to

26  proceed with arbitration of said controversy in the manner provided in said written agreement.

27  Petitioner will also seek an order awarding attorneys' fees and costs as alleged in the Petition.

28  ////

1    A copy of the supporting Memorandum of Points and Authorities is served on you

2    herewith, together with this notice.

3

4    Dated: March 23, 2007                    **MASTAGNI, HOLSTEDT, AMICK,**

5                                             **MILLER, JOHNSEN & UHRHAMMER**

6

7                                             By: _____

8                                                  WILL M. YAMADA
                                                   Attorneys for Petitioner

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MASTAGNI, HOLSTEDT, AMICK,
MILLER, JOHNSEN & UHRHAMMER
A PROFESSIONAL CORPORATION
1912 I STREET
SACRAMENTO, CALIFORNIA 95814

-2-

1  WILL M. YAMADA, ESQ. (SBN 226669)
2  KATHLEEN N. MASTAGNI, ESQ. (SBN 244298)
   **MASTAGNI, HOLSTEDT, AMICK,**
   **MILLER, JOHNSEN & UHRHAMMER**
3  *A Professional Corporation*
   1912 I Street
4  Sacramento, California 95814
   Telephone:    (916) 446-4692
5  Facsimile:    (916) 447-4614

6  Attorney for Petitioner
   Sugar Workers Union Local No. 1

7

8                **SUPERIOR COURT OF CALIFORNIA**

9                  **COUNTY OF CONTRA COSTA**

10

11  SUGAR WORKERS UNION LOCAL        )   No.  N07-0250
    NO. 1,                           )
12                                   )
                 Petitioner,         )   **MEMORANDUM OF POINTS AND**
13                                   )   **AUTHORITIES IN SUPPORT OF**
                                     )   **PETITION TO COMPEL**
14                                   )   **ARBITRATION**
    C & H SUGAR COMPANY,             )
15                                   )
                 Respondent.         )   Date:
16                                   )   Time:
                                     )   Dept:
17  _____ )   Judge

18

19                         **I.**

20                   **INTRODUCTION**

21      The Sugar Workers Union Local No. 1 (hereinafter "Petitioner"), and the C & H Sugar

22  Company (hereinafter "Respondent") are parties to a Collective Bargaining Agreement (hereinafter

23  "CBA").  The CBA contains a grievance procedure leading to final and binding arbitration of all

24  disputes concerning the interpretation or application of any provision of the CBA.  There are

25  outstanding grievances alleging Respondent violated the CBA when it terminated employees

26  Franklin Wright and Tim Shelton.  Respondent alleges there was just cause for the terminations.

27  Petitioner argues that there was not just cause and there were insufficient grounds to terminate said

28  employees.

TAGNI, HOLSTEDT, AMICK,
ER, JOHNSEN & UHRHAMMER
OFESSIONAL CORPORATION
I STREET
CAMENTO, CALIFORNIA 95814                Points and Authorities in Support of
                                         Petition to Compel Arbitration          Case No.

The Petitioner followed the steps of the grievance procedure to attempt to resolve these issues. The parties were unable to resolve their differences through the initial steps of the grievance procedure. Accordingly petitioner requested the terminations be submitted to binding arbitration per the CBA. The respondent has refused to proceed to arbitration on these two cases. Petitioner has no recourse but to seek enforcement of the arbitration provision in court.

## II.

## STATEMENT OF FACTS

On or about October 10, 2006 the Petitioner learned the Respondent had terminated Tim Shelton. Shelton is a member of the Sugar Workers Union. After speaking with Shelton, the Petitioner determined Respondent had unfairly terminated Shelton and timely pursued a grievance on behalf of Shelton. Petitioner had grievance meetings with both of Shelton's supervisors. Petitioner also had a grievance meeting with Shelton and the C&H Human Resources Director Kyle Stradleigh to appeal his termination. Respondent refused to change its decision. After commencing the grievance, the Petitioner requested a copy of Shelton's entire personnel file from the Respondent. Respondent through their representative Stradleigh agreed to produce their personnel file in conjunction with the grievance. After not receiving Shelton's personnel file in a timely manner, the Respondent again reminded Stradleigh about their request for information. Stradleigh then informed Petitioner that he needed a signed authorization from Shelton authorizing the Petitioner to receive a copy of the file. The Petitioner obtained this authorization and submitted it to the Respondent. Respondent again refused to produce the personnel file. Petitioner then filed charges with National Labor Relations Board for the Respondent's refusal to furnish a copy of the Shelton's personnel file. Ultimately, the Respondent provided the personnel file.

After numerous discussions regarding Shelton's termination, the parties were unable to reach an agreement on Shelton's grievance. Accordingly, the union requested the parties submit the dispute to arbitration. The Respondent refused to submit the matter to arbitration citing to untimeliness of the grievance.

On or about October 31, 2006 the Petitioner learned the Respondent had terminated Franklin Wright Jr. The Petitioner determined Respondent had unfairly terminated Wright and timely pursued

CAGNI, HOLSTEDT, CARLSON
ER, JOHNSEN & BURKHAMMER
PROFESSIONAL CORPORATION
STREET
AMENTO, CALIFORNIA 95814

Points and Authorities in Support of
Petitioner to Compel Arbitration

Case No.

-2-

1  a grievance on behalf of Wright. After filing the grievance, the Petitioner requested a copy of
2  Wright's entire personnel file from the Respondent. Respondent through their representative
3  Stradleigh agreed to produce the personnel file in conjunction with the grievance. After not
4  receiving Wright's personnel file in a timely manner, the Respondent again reminded Stradleigh
5  about their request for information. Stradleigh then informed Petitioner that he needed a signed
6  authorization from Wright authorizing the Petitioner to receive a copy of the file. The Petitioner
7  obtained this authorization and submitted it to the Respondent. Respondent again refused to produce
8  the personnel file. Petitioner then filed charges with National Labor Relations Board for the
9  Respondent's refusal to furnish a copy of Wright's personnel file. Ultimately the Respondent
10  provided the personnel file.

11      After numerous discussions regarding Wright's termination, the parties were unable to reach
12  an agreement on Wright's grievance. Accordingly, the union requested the parties submit the dispute
13  to arbitration. The Respondent refused to submit the matter to arbitration citing to untimeliness of
14  the grievance.

15      Pursuant to Section XX of the current CBA, the final step of the grievance procedure is
16  binding arbitration. Petitioner has exhausted all steps of the grievance procedure and has demanded
17  arbitration. Respondent's refusal to arbitrate these matters leave the Petitioner with no recourse but
18  seek enforcement of the arbitration provision in Court.

19                                    **III.**

20                                **ARGUMENT**

21  A.      **RESPONDENT IS REQUIRED TO PARTICIPATE IN BINDING**
22          **ARBITRATION REGARDING WHETHER THERE WAS JUST CAUSE**
            **TO TERMINATE SHELTON AND WRIGHT.**

23      Federal law controls the enforcement of collective bargaining agreements. Arbitration must
24  be ordered unless it can be concluded with positive assurance that the arbitration clause excludes the
25  dispute. Section 301(a) of the Labor Management Relations Act, 29 U.S.C., § 152, et seq., provides:

26

27      sutes for violating of contract between an employer and a labor organization
        representing employees in an industry affecting commerce as defined in this Act may
28      be brought in any District Court of the United States having jurisdiction of the
        parties, without respect to the amount in controversy or without regard to the

1  citizenship of the parties.
   (29 U.S.C., § 185 (1964).)

2

3      In 1957, the United States Supreme Court first held that a union may bring an action under

4  Section 301 for specific enforcement of an agreement to arbitrate. (*Textile Workers Union v. Lincoln*

5  *Mills* (1957) 353 U.S. 448.) The Court held that "the substantive law to apply in suits under Section

6  301(a) is federal law, which the courts must fashion from the policy of our National Labor Laws."

7  (Id. At 456).

8      In *Charles Dowd Box Co. v. Courtney* (1962) 368 U.S. 502, the Court held that state courts

9  have concurrent jurisdiction with the federal courts over suits brought under Section 301. Further,

10 in *Local 174, Teamsters v. Lucas Flour Co.* (1962) 369 U.S. 95, the Court made clear that federal

11 law prevails in the substantive interpretation of labor contracts. Where local laws are incompatible

12 with the principles of federal labor law, the former must give way to the latter. (Id.)

13     California Appellate Courts have consistently held that Federal law controls the enforcement

14 of private sector Collective Bargaining Agreements.

15     In the enforcement of provisions of collective bargaining agreements obligating the
   parties to arbitrate disputes, state courts exercise concurrent jurisdiction with Federal
16 courts.    In so doing state courts must, however, in adjudicating an action which
   could have been brought in the federal courts under Section 301 of the Labor
17 Management Relations Act, apply federal law. (*O'Malley v. Wilshire Oil Co.* (1963)
   59 Cal.2d 482, 486.)

18     These basic principles were recited in *Butchers Union v. Farmers Markets* (1977) 67

19 Cal.App.3d 905. After recitation of the basic principles, the court stated:

20     Federal Court decisions have held that it is for the Arbitrator to determine whether
   the party seeking arbitration has properly complied with the arbitration procedure
21 including timely notice requirements set forth in the Collective Bargaining
   Agreement. (*Id* at 910; see also *International Brotherhood of Electrical Workers v.*
22 *Silva* (1979) 96 Cal.App.3d 751, 756; *Pacific Crown Distributions v. Brotherhood*
   *of Teamsters* (1986) 183 Cal.App.3d 1138, 1143 [superior court has concurrent
23 jurisdiction in actions regarding collective bargaining agreement].

24     In the enforcement of collective bargaining agreements, the Grievance-Arbitration procedure

25 has been described as being:

26     ...at the very heart of the system of industrial self-government.  Arbitration is the
   means of solving the unforeseeable by molding a system of private law for all the
27 problems which may arise and to provide for their solution in a way which will
   generally accord with the variant needs and desires of parties.  The processing of
28 disputes through the grievance machinery is actually a vehicle by which meaning and

AGNI, HOLSTE
ER, JOHNSEN &
FESSIONAL CORPORATION
STREET
AMENTO, CALIFORNIA 95814
Points and Authorities in Support of
Motion to Compel Arbitration

Case No.

-4-

1   content is given to the Collective Bargaining Agreement....The grievance procedure
2   is, in other words, a part of the continuous collective bargaining process. (*United*
    *Steelworkers v. Warrior & Gulf Navigation Co.* (1960) 363 U.S. 574, 581.)

3       Arbitration of a labor dispute will only be denied if it can be said "with positive assurance
4   that the arbitration clause is not susceptible of an interpretation which covers the asserted dispute."
5   (*United Steelworkers v. Warrior & Gulf, supra*, 363 U.S. at 581-83.) "Doubts should be resolved
6   in favor of coverage." (*Id.*)

7       In *AT&T Technologies, Inc., v. Communications Workers of America* (1986) 475 U.S. 643,
8   the United States Supreme Court reiterated the limited scope of judicial inquiries of this nature.  In
9   addition to reaffirming the quoted language from Warrior & Gulf recited above, the Court stated:

10      [I]n deciding whether the parties have agreed to submit a particular grievance to
        arbitration, a court is not to rule on the potential merits of the underlying claims.
11      Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the
        union's claim that the employer has violated the collective bargaining agreement is
12      to be decided, not by the court asked to order arbitration, but as the parties have
        agreed, by the arbitrator.  "The courts, therefore, have no business weighing the
13      merits of the grievance, considering whether there is equity in a particular claim, or
        determining whether there is particular language in the written instrument which will
14      support the claim.  The agreement is to submit all grievances to arbitration, not
        merely those which the court will deem meritorious...."
15

16  (*AT&T Technologies, Inc., v. Communications Workers of America, supra* 106 S.Ct. At 1419.)

17      Since 1961, California law has followed the United States Supreme Court in recognizing the
18  special rule of labor arbitration as a means of resolving disputes concerning the interpretation or
19  application of Collective Bargaining Agreements between unions and employers.  In labor disputes
20  the courts of this state have held that all doubts shall be resolved in favor of arbitration. (*Posner v.*
21  *Grunwald-Marx, Inc.,* (1961) 56 Cal.2d 169, 175; *O'Malley v. Wilshire Oil* (1963) 59 Cal.2d 482;
22  *C.J. Rounds v. Joint Council of Teamsters, No. 42* (1971) 4 Cal.3d 888, 892.)

23      In *Posner v. Grunwald-Marx, Inc.,* the California Supreme Court explicitly adopted the
24  rulings and rationale of the "Steelworkers Trilogy" cases (supra) decided in June of 1960.  The
25  Posner opinion accepted the controlling formulation for all labor agreements:

26      This rule is to the effect that, where the collective bargaining agreement provides for
        arbitration of all disputes pertaining to the meaning, interpretation and application of
27      the collective bargaining agreement and its provisions, any dispute as to the meaning,
        interpretation and application of any specific matter covered by the collective
28      bargaining agreement is a matter for arbitration.  Doubts as to whether the arbitration
        clause applies are to be resolved in favor of coverage.  The parties have contracted

1  for an arbitrator's decision and not for that of the courts. The high court declared that
2  "the function of the court is very limited when the parties have agreed to submit all
   questions of contract interpretation to the arbitrator. It is confined to ascertaining
3  whether the party seeking arbitration is making a claim which on its face is governed
   by the contract. Whether the moving party is right or wrong is a question of contract
4  interpretation for the arbitrator. In these circumstances the moving party should not
   be deprived of the arbitrator's judgment, when it was his judgment and all that it
5  connotes that was bargained for." (*United Steelworkers v. American Mfg. Co., supra,*
   363 U.S. 564, 567-568.) (Id. At 175)

6      In addition, procedural questions relating to the underlying grievance must be submitted to

7  the arbitrator for decision. Federal law is well established that all procedural issues and defenses

8  must be submitted to and decided by the arbitrator so long as there is a collective bargaining

9  agreement in existence. (See *Wiley & Sons v. Livingston* (1964) 376 U.S. 543, 557 [arbitrator must

10  decide whether preliminary steps of grievance procedures have been followed]; *Association of*

11  *Industrial Scientists v. Shell Development Co.* (9th Cir. 1965) 348 F.2d 385 [dispute regarding who

12  is authorized to process grievance]; *Retail Delivery Drivers v. Servomation Corp.* (9th Cir. 1983) 717

13  F.2d 475, 477 [timeliness of grievance and demand for arbitration]; *Local Union No. 370 of*

14  *Operating Engineers v. Morrison Knudsen Co.* (9th Cir. 1987) 786 F.2d 1356 [claims of prior

15  settlements, and defenses of waivers, estoppel and mootness are for arbitrator]; *International Union*

16  *of Operating Engineers v. Flair Builders, Inc.* 406 U.S. 487 at 490-92 [defense of laches is for

17  arbitrator to decide].)

18      In summary, this Court must reject any argument that it should address and decide the

19  "merits" of the grievance or the validity of the Respondent's "procedural arbitrability" claims.

20  Controlling law prohibits this and requires the Court to compel arbitration. Petitioner has alleged

21  there was just cause in terminating Shelton and Wright. The issue is arbitrable pursuant to the CBA.

22  The merits of the allegations and procedural issues should be left for the arbitrator to decide.

23      The California Code of Civil Procedure also requires the Court to compel arbitration.

24  Section 1281 states as follows:

25      A written agreement to submit to arbitration an existing controversy or a controversy
        thereafter arising is valid, enforceable and irrevocable, save upon such grounds as
26      exist for the revocation of any contract.

27      Section 1281.2 states in part as follows:

28      On petition of any party to an arbitration agreement alleging the existence of a
        written agreement to arbitrate a controversy and that a party thereto refuses to

FAGNI, HOLSTEDT, POWELL
ER, JOHNSEN & UHRHAMMER          and Authorities in Support of
OFESSIONAL CORPORATION           tition to Compel Arbitration          Case No.
STREET
AMENTO, CALIFORNIA 95814                    -6-

arbitrate such controversy, the court shall order the petitioner and respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that :

(a) The right to compel arbitration has been waived by the petitioner; or

(b) Ground exist for the revocation of the agreement.

(c) A party to the arbitration agreement is also a party to a pending court action ... arising out of the same transaction ...
If the court determines that a written agreement to arbitrate a controversy exists, an order to arbitrate such controversy may not be refused on the ground that the petitioner's contentions lack substantive merit.

The statutes clearly require that arbitration be compelled in the instant case. There is no dispute that a written contract exists requiring arbitration for disciplinary matters. Petitioner has not waived the right to arbitrate the matter. There is no argument to support that the agreement has been revoked. To Petitioner's knowledge, there is no pending action in court arising from the transaction at issue.

In the present case, the Petitioner's claim addresses an issue clearly within the bounds of the CBA, and constitutes a violation of rights and protections negotiated by the Petitioner and agreed to by Respondent. This Court is not called upon to decide (or even address) the merits of the claim. Because this claim requires an interpretation and application of provisions of the MOU, arbitration must be compelled.

California Courts, adhering to federal principles, have also repeatedly held that procedural questions are for the labor arbitrator to decide. (*Butchers Union v. Farmers Market* (1977) 67 Cal.App.3d 905,909 [under Federal law it is for arbitrator to determine whether party seeking arbitration has properly complied with arbitration procedure, including timely notice of request for arbitration]; *Napa Association of Public Employees v. County of Napa* (1979) 98 Cal.App.3d 263, 268 [under Federal law, questions of waiver are normally for arbitrator to decide]; *Safeway Stores, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County* (1978) 83 Cal.App.3d 430, 436 [federal law controls].)

In summary, this Court must reject any argument that it should address and decide the "merits" of the grievance or the validity of the Respondent's "procedural arbitrability" claims. Controlling state and federal law prohibits this and requires the Court to compel arbitration.

1   Petitioner has alleged the terminations were without just cause. The issue is arbitrable pursuant to

2   the CBA. The merits of the allegations and procedural issues should be left for the arbitrator to

3   decide.

4       **B.    PETITIONER IS ENTITLED TO AN AWARD OF ATTORNEY FEES**

5       The precedent and analysis set forth in the Memorandum of Points and Authorities is long

6   standing and well settled. Respondent has no basis for refusing to arbitrate the underlying grievance.

7   Such refusal is disruptive to the labor relations, and calculated to delay an amicable resolution of a

8   legitimate labor dispute. As such, Respondent has acted in bad faith and an award of attorneys' fees

9   is appropriate (*United Food and Commercial Workers Union v. Alpha Beta Co.*, (9th Cir. 1983) 736

10  F.2d 1371, 1383.)

11      Recognizing the refusal to submit grievances to arbitration subverts a fundamental promise

12  of the collective bargaining relationship. The California Legislature, in 1984, added Section 1128

13  to the Labor Code. That section reads in part as follows:

14          (a) Where a party to a collective bargaining agreement prevails in a court action to
        compel arbitration of disputes concerning the collective bargaining agreement, the

15      Court shall award attorneys fees to the prevailing party unless the other party has
        raised substantial and credible issues involving complex or significant questions of

16      law or fact regarding whether or not the dispute is arbitrable under the agreement.
        (Cal. Lab. Code, § 1128(a); emphasis added.)

17

18      Because Respondent has raised no "substantial and credible issues involving complex or

19  significant questions of law or fact," Petitioner is entitled to an award or attorneys' fees pursuant to

20  Labor Code section 1128. We therefore urge the Court to issue an Award of Attorneys' fees.

21      Petitioner also submits this case merits an award of attorneys' fees under Government Code

22  Section 800. Government Code section 800 permits the award of attorney fees to the prevailing

23  party "[i]n any civil action to appeal or review the award, finding, or other determination of any

24  administrative proceeding" where there is arbitrary or capricious conduct by the administrative

25  agency or public entity. Section 800 "is a remedial statute designed to enable employees to seek

26  relief in the courts against arbitrary or capricious action by public entities or officers, and as such,

27  should be liberally construed." (*Forrest* v. *Trustees of California State University & Colleges* (1984)

28  160 Cal.App.3d 357, 368.) Attorneys' fees may be awarded under this section even though there is

1  no formal hearing preceding the administrative action.  (*Forrest* v. *Trustees of California State*

2  *University & Colleges, supra*, 160 Cal.App.3d at pp. 366-367; *A.B.C. Federation of Teachers* v.

3  *A.B.C. Unified School District* (1977) 75 Cal.App.3d 332, 335.)

4        "Arbitrary and capricious" action by an administrative agency includes conduct not supported

5  by fair or substantial reasons, a stubborn insistence on following unauthorized conduct,

6  unsubstantiated determinations, or a bad faith legal dispute.  (*In Re John K.* (1985) 170 Cal.App.3d

7  783, 798; *Kreutzer* v. *County of San Diego* (1984) 153 Cal.App.3d 62, 78.)  The determination of

8  whether an action is arbitrary or capricious is one of fact to be resolved by the court.  (*Kreutzer* v.

9  *County of San Diego*, supra, 153 Cal.App.3d at p. 78.)

10                          **IV.**

11                      **CONCLUSION**

12        The Court is requested to grant an order compelling Respondent to arbitrate the outstanding

13  disputes between the parties pursuant to the CBA.  In addition, the Court is requested to award

14  attorney fees in an amount to be established on further proof.

15

16  DATED: March 23, 2007

17                              **MASTAGNI, HOLSTEDT, AMICK,**
                               **MILLER, JOHNSEN & UHRHAMMER**

18

19                              By: _____
                                    WILL M. YAMADA
20                                  Attorney for Petitioner

21

22

23

24

25

26

27

28

TAGNI, HOLSTEDT, AMICK
ER, JOHNSEN & UHRHAMMER
OFESSIONAL CORPORATION
I STREET
AMENTO, CALIFORNIA 95814

Points and Authorities in Support of
Petition to Compel Arbitration          Case No.

-9-

1    WILL M. YAMADA, ESQ. (SBN 226669)
2    KATHLEEN N. MASTAGNI, ESQ. (SBN 244298)
     **MASTAGNI, HOLSTEDT, AMICK,**
     **MILLER, JOHNSEN & UHRHAMMER**
3    *A Professional Corporation*
     1912 I Street
4    Sacramento, California 95814
     Telephone:    (916) 446-4692
5    Facsimile:    (916) 447-4614

6    Attorney for Petitioner,
     Sugar Workers Union Local No. 1
7

8                  **SUPERIOR COURT OF CALIFORNIA**

9                    **COUNTY OF CONTRA COSTA**

10

11   SUGAR WORKERS UNION LOCAL NO.        )    No.
     1,                                    )
12                                         )    **[PROPOSED] ORDER TO COMPEL**
                    Petitioner,            )    **ARBITRATION**
13                                         )
                                           )    [Code of Civil Procedure §§ 1281et seq.;
14                                         )    29 United States Code § 152, et seq.]
     C & H SUGAR COMPANY,                  )
15                                         )    Date:
                    Respondent.            )    Time:
16                                         )    Dept:
     _____       )    Judge:
17

18

19        This matter having been considered, and good cause having been shown to the

20   satisfaction of the Court, it is hereby ordered that Petitioner's Motion to Compel Arbitration is

21   granted.  The parties are to select an arbitrator according to the process outlined in the negotiated

22   Collective Bargaining Agreement.  Petitioner is awarded reasonable attorneys' fees and costs for

23   filing this Petition.

24   Dated: _____, 2007

25

26

27                            **HONORABLE JUDGE OF THE SUPERIOR COURT**

28

TAGNI, HOLSTEDT, AMICK,
.ER, JOHNSEN & UHRHAMMER
OFESSIONAL CORPORATION
I STREET
.AMENTO, CALIFORNIA 95814

1  WILL M. YAMADA, ESQ. (SBN 226669)
   KATHLEEN N. MASTAGNI, ESQ. (SBN 244298)
2  **MASTAGNI, HOLSTEDT, AMICK,**
   **MILLER, JOHNSEN & UHRHAMMER**
3  *A Professional Corporation*
   1912 I Street
4  Sacramento, California 95814
   Telephone:    (916) 446-4692
5  Facsimile:    (916) 447-4614

6  Attorney for Petitioner
   Sugar Workers Union Local No. 1
7

8              **SUPERIOR COURT OF CALIFORNIA**

9               **COUNTY OF CONTRA COSTA**

10

11 SUGAR WORKERS UNION LOCAL        )   **No.**
   NO. 1,                           )
12                                  )
                                    )
13            Petitioner,           )   **DECLARATION OF WILL M.**
                                    )   **YAMADA IN SUPPORT OF**
14                                  )   **PETITION TO COMPEL**
   C & H SUGAR COMPANY,             )   **ARBITRATION**
15                                  )
              Respondent.           )
16                                  )   Date:
                                    )   Time:
17                                  )   Dept:
                                    )   Judge:
18 _____ )

19

20 I, WILL M YAMADA, declare as follows:

21        1.      I am an attorney duly licensed to practice law in the State of California, and I am the

22 attorney of record for Petitioner, Sugar Workers Union Local No. 1.

23        2.      I have personal knowledge of the matters set forth herein, and if called upon to testify

24 thereto, could and would do so competently, except as to those matters stated on information and

25 belief.

26        3.      Attached to this declaration as Exhibit A, is a true and correct copy of the Sugar

27 Workers Union Local No. 1 Collective Bargaining Agreement.

28        4.      Attached to this declaration as Exhibit B, is a true and correct copy of the Declaration
   of Jens Aaagaard.

5.      Attached to this declaration as Exhibit C, is a true and correct copy of the Declaration of Lawrence Ross.

6.      Attached to this declaration as Exhibit D, is a true and correct copy of a signed written authorization to obtain records by Robert T. Shelton.

7.      Attached to this declaration as Exhibit E, is a true and correct copy of a signed written authorization to obtain records by Franklin Wright.

8.      Attached to this declaration as Exhibit F, is a true and correct copy of a letter from the petitioner to respondent dated December 14, 2006.

9.      Attached to this declaration as Exhibit G, is a true and correct copy of a letter from the respondent to petitioner dated December 18, 2006.

10.      Attached to this declaration as Exhibit H, is a true and correct copy of a letter from the petitioner to respondent dated December 21, 2006.

11.      Attached to this declaration as Exhibit I, is a true and correct copy of an unfair labor practice charge filed on January 2, 2007.

14.      Attached to this declaration as Exhibit J, are true and correct copies of letters from petitioner to respondent dated February 15, 2007.

15.      Attached to this declaration as Exhibit K, are true and correct copies of letters from respondent to petitioner dated February 23, 2007.

16.      Attached to this declaration as Exhibit L, is a true and correct copy of a letter from petitioner to respondent dated February 28, 2007.

17.      Attached to this declaration as Exhibit M, is a true and correct copy of a letter from respondent to petitioner dated March 1, 2007.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief.

DATED: March 23, 2007



WILL M. YAMADA

TAGNI, HOLSTEDT, AMICK,
ER, JOHNSEN & UHRHAMMER
OFESSIONAL CORPORATION
I STREET
:AMENTO, CALIFORNIA 95814

# A G R E E M E N T

### Between

### C&H SUGAR COMPANY, INC.

### and

### SUGAR WORKERS
### UNION NO. 1
### SEAFARERS INTERNATIONAL
### UNION OF N.A.
### AFL - CIO

### Effective

### June 1, 2003



This AGREEMENT made and entered into effective the 1st day of June, 2003 by and between C&H R COMPANY, INC., hereinafter termed "Employer," and SUGAR WORKERS UNION NO. 1, SEAFARERS RNATIONAL UNION OF N.A. AFL - CIO, hereinafter termed "Union." This agreement is binding upon Employer, its successors and assigns.

## WITNESSETH:

WHEREAS, satisfactory evidence has been submitted by the Union to the Employer that more than a ajority of the employees of the Employer, in Crockett (excluding, however, warehouse employees, nployees in the Cut-In Station and certain other employees hereinafter specifically excluded) have ined the Union and have designated the Union as their representative for the purpose of collective rgaining with the Employer, and

WHEREAS, the Employer is willing to recognize the Union for the aforesaid purposes and to deal with as the representative of the said employees for the purposes of collective bargaining, it is agreed as llows:

## SECTION I

### WORK AND OCCUPATIONS

Work

Work covered by this agreement shall be all sugar refinery operations performed by employees of th Employer in Crockett, excluding work performed by employees of the Warehouse Department in the Warehouses and Cut-In Station.

Occupations

1. Occupations covered by this agreement shall be all occupations embraced within Section I A., but excluding, however, department managers, assistant department managers, superintendents, supervisors, foremen, assistant foremen, planners, assistant planners, schedulers, assistant schedulers, office employees of the Industrial Relations Department, professional employees, secretaries, and domestic servants in the Company House.

2. It is agreed that the Union shall have the right to bargain collectively for employees covered by this section while they are performing work as defined in Section I A. and for no other employees nor work.

3. Unless otherwise designated, the word "employee" or "employees" when used herein, means an employee or employees subject to the terms of this agreement and no others.

4. Employees who are not members of the bargaining unit shall not perform work covered by this agreement, except: (1) in an emergency, (2) when the safety of any employee is in jeopardy, (3) when conducting training which cannot be done by a bargaining unit member, or (4) to provide recess period and personal emergency relief for Security. (For definition of "emergency" see Section XXVIII.)

5. Members of the bargaining unit will provide "hands on" training on union jobs for relief supervisors up to the standard training time.

In administering the provisions of this agreement, no employee shall be discriminated against by the Employer or the Union because of race, color, religion, sex, age, veteran status, citizenship, national origin, disability, marital status or medical condition.



If a situation arises where the Employer feels a reasonable accommodation for a disabled employee can or should be made under the Americans with Disabilities Act, the Employer will advise the union before taking any action.  If Employer and the union disagree on what reasonable accommodations are to be made, such disagreements shall be resolved pursuant to Section XX of this agreement.

SECTION II

WAGES

1.  Exhibit "B," attached hereto, sets forth the wage rate for each classification as of the effective date of this agreement.  The wage rates include a back-to-back differential in the same amounts that were in effect on September 1, 1951, and which shall be payable only so long as back-to-back workweek operations continue.

2.  Effective June 1, 2003 basic wage rates in effect on May 31, 2003 shall be increased by 4%.

3.  Effective June 1, 2004 basic wage rates in effect on May 31, 2004 shall be increased by 3%.

4.  Effective June 1, 2005 basic wage rates in effect on May 31, 2005 shall be increased by 2%.

5.  All employees covered by this agreement shall be covered by the following cost-of-living allowance:

    a.  If the Bureau of Labor Statistics Consumer Price Index, (CPI-W) all items, 1982-1984 base, for the city of San Francisco for April, 2004 exceeds said Index for April, 2003 by more than 5%, then wage rates in effect on May 31, 2004 shall be further increased, effective June 1, 2004, by a percentage (not to exceed 3%) equal to the excess above 5%.

    b.  If the Bureau of Labor Statistics Consumer Price Index, (CPI-W) all items, 1982-1984 base, for the city of San Francisco for April, 2005 exceeds said Index for April, 2004 by more than 5%, then wage rates in effect on May 31, 2005 shall be further increased, effective June 1, 2005 by a percentage (not to exceed 3%) equal to the excess above 5%.

6.  In computing percentile adjustments to wage rates, the percentages shall be applied to the hourly rate and shall be rounded to the nearest whole cent.

7.  Notwithstanding the foregoing, all employees hired on a daily rated job having less than twelve (12) months continuous service shall be paid at a rate which is 10% less than the rate shown for their jobs on the Exhibit "B" until they have completed twelve (12) months continuous service, at which time their rate shall be increased to the rate shown for their jobs on Exhibit "B."

8.  A Christmas award will be paid in each year of the contract to all employees who are on roll on December 1.  For those employees with five (5) years of service or working on a biweekly rated job for the entire year, the Christmas award will be calculated at 3 percent (3%) of the employee's annual straight-time salary based on the wage rate of the job the employee holds on December 1 of each year.  For all other employees, the Christmas award will be based on the same formula used in 1978 and based on current rates.  For purposes of wage comparisons only, the Christmas award will be identified and recognized as a wage item.



## SECTION III

## HOURS

**Work Day**

1.  a.  Eight (8) hours shall constitute a day's or night's work. Said 8 hours may not be staggered except that one meal period may be scheduled on employee's time. The meal period shall be one-half hour, except that a one-hour meal period may be scheduled when, in the judgment of the Employer, the work requirements of a job make such a schedule necessary.

    b.  Whenever it is necessary to change a one-half hour meal period to a one-hour meal period the employee involved will be given notice of such change on the previous day, if possible to do so. In the absence of such notice, the employee shall be compensated at time and one-half of the straight-time rate for the time worked after the normal quitting time on the first day the extended meal period is required.

2.  Any employee working a shift with not more than eight (8) hours elapsed time from beginning to end of shift (as, for example, the 7:30-3:30, 3:30-11:30 or 11:30-7:30 shifts) shall be given a 30-minute meal period on Employer's time or be entitled to the lunch period differential provided by Section X B.

3.  Meal periods are to begin not less than three (3) hours nor more than five (5) hours after the commencement of the shift.

**Work Week**

The work week is the 7-day period commencing at 11:30 p.m. Sunday and ending at 11:30 p.m. the following Sunday except for those employees who work a 4:30 p.m. to 1:00 a.m. shift; 5:00 p.m. to 2:00 a.m. shift; Maintenance Services Department employees who work a Monday to Friday schedule; and those employees who work on the reverse back-to-back schedule. For those employees, the workweek is the 7-day period commencing at 7:30 a.m. Monday and ending at 7:30 a.m. the following Monday.

**Recess Periods**

Each employee who heretofore has had recess periods shall be entitled to be away from the job for a recess of ten (10) minutes during each one-half (1/2) shift, with relief where such relief has been customary heretofore. Recess periods shall be scheduled as close to the middle of each one-half (1/2) shift as is reasonably practicable, subject to operating requirements. Only in the event of personal emergencies shall any employee exceed the ten (10) minute recess period or take more than one recess during each one-half (1/2) shift. (For definition of "emergency" see Section XXVIII.) Each employee shall be on the job (job or shop in the case of the Maintenance Services Department), ready to receive work assignment, at the beginning of the shift and may not leave the job (job or shop in the case of the Maintenance Services Department) either at the lunch period or quitting time until the appropriate time to do so.

3

**Work Schedules**

1.  Work schedules will be published from time-to-time by the Employer, as follows:

    a.  General Operating Department schedule.

    b.  Operations Departments - Skeleton Crew schedule; for shutdown periods which shall be published at or about the beginning of each operating period to cover the succeeding shutdown period.

    c.  General Maintenance Services Department schedules, including Monday to Friday schedule, reverse back-to-back schedule and reverse 3 and 1 schedule.

    d.  Maintenance Services Department - Supplementary schedules which shall cover work days for (1) shift groups, (2) operating mechanics, and (3) one Power Station Maintenance Man shall work the Monday to Friday schedule and one shall work the reverse back-to-back schedule depending on need.

    e.  General Technical Operations Department schedule, covering all employees of the Technical Section except a certain designated group which works in accordance with the General Operating schedule.

    f.  Industrial Relations Department - Special schedules will be prepared to cover all positions.

    g.  Stores Section - Special schedules will be prepared to cover all positions including a reverse back-to-back schedule and a reverse 3 and 1 schedule.

2.  Revisions of these work schedules may also be published from time to time by the Employer. All work which conforms to these schedules shall be at straight-time rate of pay whenever 48 hours' notice of such revision is given; otherwise, any days in such revisions not previously scheduled shall be at the overtime rates of pay.

3.  A "schedule" is defined as the regularly established days of work and rest involved in a particular job or assignment.

    a.  Noncontinuous job schedules consist of consecutive work days (holidays excepted), with two (2) scheduled days of rest, which may be scheduled either:

        (1)  Before, or

        (2)  After, or

        (3)  Before and after the work period.

    b.  Continuous job schedules apply to those jobs or assignments which must be performed in whole or in part on each day of the year with work days scheduled in accordance with past practice according to the particular job or assignment involved and with two scheduled days of rest.

5.  No change in the established schedule for a job or an assignment may be made for the temporary convenience of an employee. A scheduled workday may not be taken off on "Personal Time" and the employee allowed to "make up" the day by working a day not included in the established schedule for the job or assignment.

6.  Employees may request a flexible schedule subject to the following:

a) Schedule must be approved by the department management.
b) The flexible schedule will be in effect on a month to month basis subject to supervisory approval.
c) Only straight day employees, working jobs that do not require a relief, will be eligible to work a flexible schedule.
d) A flexible schedule will be limited to beginning no earlier than 2 hours before the regular shift start time and ending no later then 2 hours later than the regular stopping time.
e) The approval or denial of the request for a flexible schedule is the exclusive right of the Company.

### SECTION IV

### BIWEEKLY PAY

Each employee who has completed five (5) years of continuous service with the Employer (on roll) irrespective of job classification, shall be transferred from the daily payroll to the biweekly payroll and thereafter shall be entitled to the appropriate benefits.

### SECTION V

### PREMIUM PAY

**Overtime Work**

1.  Any work performed by an employee in excess of eight (8) hours on any shift or in excess of forty (40) straight-time hours in any workweek shall be at the overtime rate of pay.

    The overtime rate of pay shall be 1-1/2 times the regular straight-time rate of pay which means the employee's rate of pay while working non-premium or non-overtime hours or days.

2.  An employee who works in excess of twelve (12) hours consecutively or in the same workday shall receive double the straight-time rate for all work in excess of twelve (12) hours.

3.  A 7:30 a.m. to 4:00 p.m. day shift employee performing emergency work between 11:30 p.m. and 3:30 a.m. or after 3:30 a.m. if the work started prior to 3:30 a.m., will be given the equivalent number of hours worked between 11:30 p.m. and 7:30 a.m. off with straight-time pay on the following eight (8) hour day shift if a scheduled day of work for the employee (whether as a regularly scheduled day of work or as overtime to be performed on a scheduled day of rest).  The employee will be required to take this time off, and will have an option, that has to be exercised prior to leaving the refinery, of taking the time off at either the beginning or at the end of the following day shift.  However, if the emergency work cannot continue or other essential work of Employer cannot be performed if the employee takes the time off beginning at 7:30 a.m., the foregoing will not apply except that if the emergency work or other essential work of Employer is completed before the end of the employee's following day shift, then the number of hours worked between 11:30 p.m. and 3:30 a.m. or after 3:30 a.m. if the work started prior to 3:30 a.m., not in excess of the hours remaining in the shift will be given off with pay at the end of the shift.  (For definition of "emergency" see Section XXVIII.)

    The provisions of this section applicable to employees working a 7:30 a.m.-4:00 p.m. day shift do not apply to those employees working on a rotating shift.



**Work on Scheduled Days of Rest**

1.  Whenever any employee is required to work on a scheduled day of rest, the employee's pay for such work shall be governed by the following conditions:

    a.  When no change of schedule is involved, time and one-half shall be paid for all work performed on any of the scheduled days of rest. Such time worked, up to eight (8) hours in each day shall be counted toward the forty (40) hours in the work week after which weekly overtime is paid.

    b.  When and if refinery operations are curtailed, resulting in less than five (5) scheduled work days per week, an employee working a day other than one of the two normally scheduled rest days (holiday and day scheduled off in lieu of holiday excepted) shall receive straight-time pay provided at least forty-eight (48) hours' (two (2) calendar days) notice is given prior to commencing work on such day. When such prior notice is not given, the overtime rate of pay will apply. Whenever a holiday occurs during a shutdown weekend and as a result thereof the plant starts up on Thursday, instead of Wednesday, employees who are called in for the start-up on 3:30-11:30 shift Wednesday shall receive the overtime rate of pay.

    c.  An employee may be changed from one schedule to another without the payment of overtime, provided the employee is given forty-eight (48) hours' (two (2) calendar days) notice of such change prior to the start of the new work week. In the event of failure to give such notice, the change will be covered as in d. below.

    d.  An employee may be changed from one schedule to another within the work week. The schedule under which the employee starts the work week governs the day or days of rest for that week, and if any work is performed on such scheduled days of rest the employee shall be paid at the overtime rate.

    e.  The normal quitting time for any Maintenance Services Department employee on the operating schedule who performs work on a day of rest on their own station will be the same quitting time as on a regularly scheduled day of work.

        Whenever a Millwright Electrician (shift) performs work on a day of rest, the normal quitting time will be the same as the quitting time on a regularly scheduled day of work, except when assigned to work in Construction or on plant order work. (In which cases the shift would be eight and one-half (8-1/2) hours elapsed time.)

2.  If an employee has worked both Saturday and Sunday during two (2) consecutive periods of scheduled days of rest (as defined in subparagraph 3. below) and if the employee is required to work either Saturday or Sunday during the third consecutive period of scheduled days of rest because of the refusal of other qualified employees to work, that employee will be granted one day of personal time off to be taken at a time mutually agreeable to employee and employer. When specifically requested and whenever possible such days of personal time off will be granted contiguous with a scheduled vacation period. In the case of an employee on the universal schedule, the above option becomes available to the employee after having worked each of the last six (6) scheduled days of rest. If an employee voluntarily works on both Saturday and Sunday during the third consecutive period of scheduled days of rest, the above option shall not be operative. However, if such an employee declines to volunteer to work on both Saturday and Sunday during the fourth consecutive period of scheduled days of rest, and if the employee is ordered to work on one or both such days, the employee shall be granted one (1) day personal time off as above provided. Station layby and early start-ups are not considered as days worked for purposes of this paragraph.

3.    For purposes of subparagraph 2. above "periods of scheduled days of rest" is defined as follows:

       (i)    Back-to-back schedule - the four (4) shutdown days following the ten-(10) day operating period.

       (ii)    Monday-Friday schedule - Saturday-Sunday.

       (iii)    Technical schedule (3 and 1) - the three (3) days of rest following the second week of an operating period.

       (iv)    Reverse back-to-back schedule - the four (4) days of rest following the first week of an operating period.

       (v)    Reverse 3 and 1 schedule - the three (3) days of rest following the first week of an operating period.


## Work on Holidays

1.    All employees shall receive (in addition to holiday pay to which they may be entitled under this agreement) time and one-half the regular straight-time pay for work performed on the holidays specified in Section VII hereof.

2.    When work on noncontinuous jobs is scheduled to be performed on a holiday, Employer will first attempt to secure volunteers from among currently qualified employees. Employees will be ordered to work only if there are insufficient qualified volunteers.

     Except where an employee has volunteered for such work, Employer will, whenever possible, give forty-eight (48) hours' notice to any employee holding a noncontinuous job who is required to work on a shutdown Friday which is a recognized holiday.

4.    If an incumbent on a continuous job makes a request not to work on a holiday, the Employer will attempt to obtain a relief for that employee.

## Shift Changes

1.    Whenever it is necessary to change an employee from one shift to another, the employee will be given notice of such change twenty-four (24) hours prior to the commencement of the new shift, if possible to do so. In the absence of such notice, the employee shall be compensated at time and one-half of the straight-time rate for the first day of work on the new shift. This provision shall not apply, however, under the following conditions:

     When an employee is changed from the 7:30-4:00 to 7:30-3:30, or vice versa.

    b.    When an employee is changed from one shift to another to fill a posted job (other than the one the employee is then occupying), for which the employee has applied and has been appointed.

    c.    When employees change shifts at their own request.

    d.    When an employee is changed from one shift to another for the purpose of serving on or attending any Union Committee or meeting or at the request of any union representative.

2.   **Double Back**

Time and one-half of the straight-time rate will be paid on the first day for a scheduled change of shift that results in less than 16 hours (excluding overtime) between the end of one scheduled eight-hour shift and the beginning of the new eight-hour shift.

This clause does not apply to changes in shift related to the 8-2-4 or 9-1-4 operating method or to a shift change as a result of a request by an employee.

**Five (5) Hours Without a Meal**

Any employee who is required to work more than five (5) hours without a meal shall receive overtime for all work performed in excess of five (5) hours at 1-1/2 times the straight or overtime rate, as the case may be.

**Staggered Hours**

Any employee whose hours are staggered after starting shift shall be paid overtime for all hours worked after the expiration of their normal working day.

**Computation of Premium Pay**

All overtime and premium rates provided for in this agreement are based on regular straight-time rates of pay and, except for Paragraph E. of this section nothing herein calls for payment of one overtime or premium rate based on another overtime or premium rate.

## SECTION VI

## ASSIGNMENT OF OVERTIME WORK

**Minimum Guarantee**

1.   Any employee required to work overtime following a meal period shall be given a minimum of two (2) hours overtime work and shall receive a minimum of two (2) hours overtime pay provided the employee is notified of such overtime assignment prior to scanning out on the payroll system.

2.   The scheduling of less than two (2) hours of overtime immediately adjacent to an employee's shift shall not be affected by the foregoing paragraph.

**Notice Required**

1.   If an employee, while on the job, is assigned to work overtime following the employee's shift, the employee shall be given as much notice as possible, and in any event not less than two (2) hours' notice of such assignment, except in cases of emergency, when the employee shall be given as much notice as is possible under the circumstances. An employee compelled to work overtime in the absence of an emergency, who is not given the notice required by this section, shall be compensated as the Arbitrator may determine.  (For definition of "emergency" see Section XXVIII.)

2.   a.   If an employee has been notified before the start of their shift of an overtime assignment to commence at the end of such shift, and if, for reasons beyond the employee's control, overtime work is not available, the employee shall receive straight-time pay for the scheduled overtime not worked unless notice that the overtime work will not be available is given not less than two (2) hours before the overtime was scheduled to commence.

8

b.  An overtime assignment scheduled to precede a scheduled shift may be cancelled without penalty by giving at least two (2) hours' notice before the overtime assignment was scheduled to commence. If such an overtime assignment is cancelled with less notice the employee will receive straight-time pay for any scheduled hours of overtime which are not worked.

c.  When an employee has been notified during their shift of an overtime assignment to begin at the end of that shift, the overtime assignment may be cancelled without penalty by giving at least one-half (1/2) hour's notice prior to the end of the shift. If such an overtime assignment is cancelled with less notice, the employee will receive straight-time pay for any scheduled hours of overtime which are not worked.


**Overtime Rotation and Equalization**

1.  If Employer desires overtime work to be performed, the work shall be offered to eligible employees in the order of the applicable overtime rotational or equalization list. Employees may decline overtime so offered, provided that if insufficient qualified employees have accepted the offered overtime, then Employer may direct those employees standing at the head of the applicable list, up to the number of employees needed, to accept the overtime assignment. However, an employee shall not be required to accept an overtime assignment when compelling personal considerations of an unusual and emergency nature exist. (For definition of "emergency" see Section XXVIII.)

2.  Overtime rotational lists will be maintained as in the past, and Employer will make every effort to rotate overtime assignments in an equitable manner among employees who are eligible for such assignments and capable of performing them. When a specific task is normally performed by a limited group, overtime will be rotated among members of that group. Overtime on non-posted jobs will first be offered to employees in the group that normally performs that work. If there are insufficient volunteers from within that group, the overtime will be offered on a rotational basis to the posted job incumbents on that station who can perform such work without training, before going off station. Each supervisor will keep a record of the overtime worked by employees under their supervision. This record will be available for the inspection of the employee or Union representative upon request.

3.  The filling of vacancies in the Operations Department will be done by using straight-time labor whenever possible. If it is necessary to use overtime to cover a vacancy, it will be first offered to the incumbents then performing the function. If one of the incumbents does not want to work 12 hours, an employee from another area who is qualified will be assigned on straight time and overtime used on that job to cover the 4 hours.

No employee will be scheduled or have the right to work 16 hours unless the function cannot be covered any other way.

4.  The craft overtime equalization list will be followed in each craft and all refusals properly recorded. Any overtime in Construction that is on a job that has not been performed by a craftsperson in Construction will be offered to members of the craft involved based on the overtime equalization list. Any overtime in Construction that is refused by the craftsperson on the job and it is determined that the overtime work will be performed, it will be offered to members of the craft involved on the basis of the overtime equalization list.

5.  If errors occur in the assignment of overtime, every effort will be made to provide, within thirty (30) days, at a time mutually agreeable between the Employer and employee, an overtime assignment of equivalent number of hours, which will not deprive another employee of an overtime assignment. Such overtime assignment will be in the employee's normal area of

activity. If such overtime assignment is not made within thirty (30) days, the Employer will pay the employee straight-time pay for the equivalent number of hours of overtime lost, or credit the employee with equivalent number of hours to a personal time off account.  Such personal time off shall be taken with pay, within six (6) months of the original error in overtime assignment, at a time mutually agreeable to employee and Employer.  Provisions of this clause are not applicable if the Employer has provided three (3) opportunities for makeup overtime assignment of equivalent number of hours and the same type of overtime; i. e., contiguous with shift, work on scheduled day of rest, etc.

## SECTION VII

## HOLIDAY PAY

The recognized holidays are as follows:

| | |
|---|---|
| New Year's Day | Personal Holiday |
| Easter Sunday* | Labor Day |
| Memorial Day | Thanksgiving Day |
| Fourth of July | Christmas Day |

*For employees who are not scheduled to work on Easter Sunday, Good Friday will be the holiday.

The personal holiday will be scheduled by mutual agreement between the Employer and the employee.  Each eligible employee will have an option of taking the personal holiday or taking cash in lieu of the holiday.  On November 1 of each year, every employee that has not taken the personal holiday, scheduled it, or taken cash in lieu thereof, will have until November 15 to schedule the holiday or receive cash in lieu thereof.

In addition to the above holidays, there shall be three (3) "floating holidays" to be designated by Employer prior to February 1 of each year.  The floating holidays will be scheduled (to the extent operating requirements permit) to give long weekends and/or avoid one day shutdowns.

Holiday pay in the amount of eight (8) hours straight-time shall be paid for each of the holidays specified above to each employee who has been "on roll" for more than six (6) months subject to the following conditions:

1.    Holiday pay shall continue as in the past to be paid for holidays falling on regularly scheduled shutdown days between operating periods.

2.    Holiday pay shall be paid for holidays falling during a period of excused absence of a two-(2) week period or less.

3.    Holiday pay shall be paid during absences on account of verified illness or injury.

4.    Holiday pay shall not be paid for a holiday occurring while an employee is on a leave of absence.

5.    Holiday pay shall not be paid to members of SWU #1 for holidays which fall during a period in which SWU #1 is on strike against the Employer.

6.    Holiday pay shall not be paid to any employee who fails to work on a holiday when ordered to do so.

7.    Holiday pay shall not be paid to daily rated or five-(5) year biweekly employees who fail to work because of personal absenteeism on their scheduled work days immediately preceding and immediately following the holiday, unless such absence on one or both of such days has been authorized in advance by their supervisor.

Whenever any of the holidays specified above fall on a Saturday which would have been a scheduled day of rest, in the absence of the holiday, the Friday preceding shall be considered the holiday for all purposes of holiday and overtime pay.

Whenever any of the holidays specified above (other than Easter Sunday) falls on a Sunday, the Monday following shall be considered the holiday for all purposes of holiday and overtime pay.

Any of the recognized unworked holidays for which an employee is eligible and is paid holiday pay shall be considered as eight (8) hours of straight-time worked for the purpose of computing overtime after forty (40) hours.

## SECTION VIII

## REPORT PAY

A minimum of four (4) hours straight-time shall be paid to any employee who reports for duty pursuant to orders.

As applied to work in excess of eight (8) hours per day, the foregoing clause applies solely to emergency call-ins which were not scheduled prior to the employee's quitting time and to assignments which are scheduled to begin more than one (1) hour after the employee's quitting time. (For definition of "emergency" see Section XXVIII.)

When an employee reports for work following an absence from which the date of return is unknown to the Employer, the employee may be sent home without pay unless the employee has given the Employer at least four (4) hours notice before reporting for work.

## SECTION IX

## SEVERANCE PAY

If an employee with three (3) or more years of continuous service is laid off because of equipment or methods changes (including an employee who is laid off because of a change in another employee's job), the employee shall be entitled to severance pay equal to one (1) week's wages for each full year of employment, partial years in proportion, plus an amount equivalent to two (2) weeks' wages. If an employee with three (3) or more years of continuous service is assigned to a different job because of an equipment or methods change affecting their job, and if (1) the job to which transferred is a lower rated job, and (2) the employee is not offered rate protection as hereinafter defined, then such employee shall be entitled to severance pay equal to one (1) week for each full year of employment, partial years in proportion, plus an amount equivalent to two (2) weeks' wages. An employee entitled to severance pay may elect to receive such pay at any time on or before the 180th day from their date of layoff or from the date on which they are assigned to a different job because of an equipment or methods change affecting their job. Receipt of severance pay shall eliminate employee status for all purposes of this agreement. An employee shall have "rate protection" whenever their rate of pay equals or exceeds the rate of pay which they were receiving immediately prior to their transfer, whether such rate of pay is a personalized "red circle" rate or the contractual rate for the job to which they are assigned.

A First Class Journeyman with ten (10) or more years continuous service who, because of a reduction of personnel in their craft, is transferred to another job may (unless the job is a craft position of equal pay for which a vacancy exists) refuse such transfer and elect instead to accept severance pay. Severance pay shall equal one (1) week's wages for each full year of service, partial years in proportion, plus an amount equivalent to two (2) weeks' wages. Receipt of severance pay shall terminate employee status for all purposes of this agreement. Application for severance pay shall be made within two (2) weeks after the employee is given notice of proposed transfer; failure to apply for severance pay within such two-(2) week period shall constitute acceptance of transfer.

## SECTION X

## DIFFERENTIALS

**Shift Differential**

1.   Shift employees that work ~~rotating~~ shifts (7:30-3:30, 3:30-11:30, 11:30-7:30) shall receive a fixed daily shift differential of $2.50.

2.   Shift differential shall be considered as a part of the "basic wage" only for purposes of calculating overtime earnings and vacation pay.  Vacation pay shall include the shift differential which would have been paid had the employee worked at straight-time on the shift(s) to which they would have been assigned but for the scheduling of vacation.

3.   Shift differential will be applied to the straight-time hours as well as the premium hours.

**Lunch Period Differential**

On shift jobs where it is necessary for the employee to eat their meal without interrupting the performance of their regular duties, a differential of $2.50 per day shall be paid in the employees pay check..

## SECTION XI

## MEAL ALLOWANCE

Whenever employees are required to work two (2) hours overtime or longer immediately before or after their shift, they will be paid $5.00 for a meal.  This will be paid in the employees pay check.

## SECTION XII

## VACATIONS

**Vacation Allowance**

1.   Vacation allowance shall be credited to "on roll" employees on January 1 of each year for all months worked in the year prior thereto.

2.   Annual vacation allowance for employees on January 1 shall be:

   a.   For all employees with less than twelve (12) months credited service, a pro rata vacation based on number of months worked in the previous year; except that no employee shall be eligible to take any vacation until they have completed six (6) continuous months "on roll."

   b.   For those with twelve (12) months but less than ten (10) years continuous service, ten (10) work days off with pay.

   c.   For those with ten (10) years but less than fifteen (15) years of continuous service, fifteen (15) work days off with pay.

   d.   For those with fifteen (15) years but less than twenty-five (25) years of continuous service, twenty (20) work days off with pay.

   e.   For those with twenty-five (25) years or more of continuous service, thirty (30) work days off with pay.

3.  The above vacation allowances are subject to adjustments provided in Paragraph C.

4.  Vacation pay allowance shall be based on:

The straight-time job rate the employee had at the time their vacation commenced, plus the shift differential applicable to the shift(s) the employee would have worked but for the scheduling of vacation.

5.  Employees laid off for lack of work and subsequently rehired within 180 days shall be eligible for the same vacation as if they had been on roll during the layoff period less a pro rata adjustment for each calendar month laid off and less any part of the vacation previously paid at time of layoff.  In computing such vacations for portions of a calendar month on roll, fifteen (15) days or more on roll in a given calendar month shall be counted as one calendar month; less than fifteen (15) days on roll within a given calendar month shall not be counted toward vacations.

6.  Employees on long-term disability benefits shall not be eligible for vacations or vacation allowance.

**Vacation Periods**

1.  Vacations may be scheduled at the sole discretion of the Employer, except that no employee entitled to two (2) weeks vacation or less shall be required to take such vacation before June 1 or after September 30.  Employees entitled to more than two (2) weeks vacation may be required to take the portion in excess thereof outside this period, at times more convenient to the Employer.  Employees with twenty (20) or more years of service may, not more often than once every five (5) years, request four (4) consecutive weeks of vacation during the period June 1 through September 30.  Employer shall grant such requests to the extent practicable.  Not more than 1/5th of the employees from any department, craft or other group whose vacations usually affect one another and who are eligible for such four-(4) consecutive-week vacations, shall be granted such vacations in any one year.

2.  Banked vacation may be taken in four (4) hour increments in accordance with Section XII; B.,4.a.

3.  Vacation periods, once scheduled by the Employer or at the request of an employee, may be changed by the Employer or an employee only upon two (2) weeks' notice prior to the date the vacation was scheduled to commence, unless shorter notice is mutually agreeable to the employee and the Employer.

4.  **Vacation Banking**

a.  Employees may bank all but one week of their vacation, one week at a time.  Banked vacation can be taken at a mutually agreeable time in 4-hour to 4-day increments. Normally, advance notice of no less than two (2) days must be given when banked vacation is desired to allow for relief labor scheduling.

b.  Overtime may be used if necessary to relieve those requesting banked vacation.

c.  Any scheduled week that an employee, at a later date elects to bank, will not be available to other employees to reschedule their vacation.  However, the Company will review requests as in the past and if the move can be made without making multiple moves as a result of that request, it may be granted.  This will be up to the discretion of the department manager.

d.  Time in the vacation account will not be cumulative and any balance remaining at the end of the year will be paid in cash.

13



5.   Employees may opt to receive cash in lieu of scheduled vacation for all earned vacation in excess of one week.  Employees must declare their intention to take cash in lieu of vacation in January of each year.  Employees may receive cash for vacation in no less than five-day increments.  Any <u>scheduled</u> week of vacation that an employee, at a later date, opts to receive in cash, will not be available to other employees to reschedule their vacation.  However, the Company will review requests as in the past and if the move can be made without making multiple moves as a result of that request, it may be granted.  This will be up to the discretion of the department manager.

## Adjustments

Employees who have been "on roll" the required period are subject to the following conditions which affect their vacation allowance:

1.   **Leaves of Absence**

Employees on roll five (5) years or more:  After five (5) years "on roll" leaves of absence not exceeding three (3) months' duration in any twelve (12) calendar months will not count as lost time.  Leaves of absence exceeding three (3) months' duration in any twelve (12) calendar months will disqualify the employee to the extent of one (1) day of vacation for each month of leave in excess of three (3).

Employees on roll less than five (5) years:  Employees with less than five (5) years of service will have leaves of absence counted as "lost time," forfeiting 5/6th of one (1) day of vacation for each month on leave.

2.   **Sickness**

Time lost by reason of sickness or injury, not in excess of ninety (90) working days, shall not constitute a forfeit against any vacation allowance.  Time lost for such reasons in excess of ninety (90) working days (other than injury covered by workers compensation liability of C&H) shall count as lost time, forfeiting one (1) day of vacation for each month of such lost time.

3.   **Union Action**

Time lost by reason of action of the Union shall be considered as "lost time," forfeiting one (1) day of vacation for each thirty (30) calendar days of such time lost.

4.   **Personal Time Off**

Time lost by reason of occasional days off on personal time shall not constitute a forfeit against any vacation allowance.

## Termination of Employment

Employees eligible to take a vacation who terminate their employment shall receive all vacation allowance accrued between date of termination and January 1 of the previous year, less any vacation allowance already received for such period and less any disqualifying time.

## Miscellaneous

1.   Vacations shall not be cumulative from year to year, except that:

a.   An employee who, because of sickness or injury, becomes unable to work prior to

 

commencing their vacation for a given year, and whose sickness or injury extends continuously into the next calendar year, shall take their vacation for the prior year at a time convenient to the Employer and before June 1 or after September 30.

b. An employee with fifteen (15) or more years of service may postpone all or part of vacation allowance in any one year for the sole purpose of taking an extended vacation in the following year, subject to these conditions:

(1) The accumulated vacation must be taken consecutively with current earned vacation.

(2) No more than two (2) weeks of the total vacation may be taken during the preferred period. An exception may be granted if agreeable to the Employer.

(3) That portion of an accumulated vacation that has been carried over from a previous year shall be at the employee's regular rate of pay at the time the vacation is taken plus the shift differential that would have been paid but for the vacation.

2. Whenever the vacation period of any employee includes one of the recognized holidays, they shall receive an additional day of vacation which shall be scheduled by the Employer either immediately before or after the vacation period.

## SECTION XIII

## FUNERAL LEAVE

In the event of a death in the immediate family of an employee who has one (1) or more years of rvice with the Company, such employee shall, upon request, be granted such time off with pay as is cessary to make arrangements for the funeral and attend same, not to exceed three (3) regularly heduled working days for in-state funerals and five (5) regularly scheduled working days for out-of-state nerals. This provision does not apply if the death occurs during the employee's paid vacation, or while employee is on leave of absence, layoff, or sick leave, and does not apply to death resulting from rthquake or war.

For the purposes of this provision, the immediate family shall be restricted to father, mother, other, sister, spouse, child, mother-in-law, father-in-law, grandparents, grandchildren, stepparents, epchildren, sister-in-law, brother-in-law and grandparents-in-law. At the request of the Employer, the iployee shall furnish a death certificate and proof of relationship.

Funeral leave applies only in instances in which the employee attends the funeral, or is required to ike funeral arrangements, but is not applicable for other purposes such as settling the estate of the ceased.

## SECTION XIV

## EMPLOYMENT, ADVANCEMENT AND RETENTION

Governing Policy

The long standing policy of the Employer with respect to employment, transfer and retention of employees shall continue. The Employer, when promoting employees, shall give due consideration to (1) individual merit, (2) physical, moral and mental capacity and general fitness, (3) length of service with the Employer, and (4) qualification. Whenever employees have equal qualifications for promotion, the employee having seniority shall have preference.

## Determination of Seniority

1. **Probationary Period**

   a. All new employees shall be regarded as probationary employees during the first one hundred and twenty (120) working days of employment. A probationary employee shall have no seniority rights and retention as an employee is entirely within the discretion of the Employer.

   b. When extra operating days are worked by a probationary employee, the time worked will be credited towards the probationary time of the employee.

   d. Not more than five (5) days absence for any reason will be credited toward computing the one hundred and twenty (120) working days of the probationary period; however, a probationary employee may not complete the probationary period while absent.

   e. At the end of the probationary period the employee shall be classified as a regular employee with plant seniority computed from the date hired.

2. **Appointment Seniority**

   Seniority on posted jobs shall commence on the date of selection.

## Reduction in Forces

1. **Decrease in Department and Craft Personnel**

   Reduction in personnel in any department or in any craft shall be made by transfer in the reverse order of appointment or craft seniority, except that employees possessing needed skills of filling jobs which cannot be satisfactorily performed by other employees may be retained regardless of such seniority. Employees so transferred shall be assigned to other jobs in accordance with previously acquired appointment seniority, or if no such seniority has been acquired, may have the opportunity of replacing employees with lesser plant seniority on non-posted base rate jobs in the Packaging or Process Departments. This clause does not apply to employees with less than one (1) year seniority.

2. **Individual Layoffs**

   a. Individual layoffs which are necessary after the operation of the foregoing clause shall be made in the reverse order of plant seniority from the department, or departments in which such layoffs are necessary.

   b. The customary five-(5) day notice of layoff shall not be required with respect to employees who are not on duty at the time of the layoff.

   c. Such employees who have been so laid off shall have priority over other applicants for employment, and shall be rehired in the reverse order of the layoff.

   d. (1) Layoffs for less than 180 consecutive calendar days shall not constitute a break in service and every employee rehired without a break in service shall be credited with accumulated plant seniority.

   (2) An employee who is laid off will retain posted job rights for up to 180 days of layoff and will not have appointment seniority dates adjusted upon recall unless the job has been posted in the interim, in which case appointment seniority will be adjusted to date of recall.



3.  **Work During Extended Plant Shutdowns**

   a.  Jobs which must be performed during an extended plant shutdown, shall be assigned to employees on the basis of plant seniority, without regard to department, provided such employees are capable of performing the required work without additional training.

   At least 72 hours prior to an extended plant shutdown, the Company will meet with the Union and review the jobs to be performed and employees to be assigned to work. A notice will be posted at least 48 hours before the end of each schedule prior to an extended plant shutdown. Such notice will show which jobs are scheduled to be performed during the extended plant shutdown and those employees scheduled to perform the jobs. No claims for pay because of errors in such assignment can be made if the error is not reported to the Company prior to the end of the last shift preceding the shutdown period.

   If an employee refuses the opportunity to work during a plant shutdown, the Employer is not obligated to ask that employee to work on any other job unless subsequent to that work becomes available within that employee's department for which that employee is qualified.

   b.  Assignments to Security will be on the basis of company seniority of those employees who currently hold job rights and are capable of performing the required work without additional training.

   c.  When operations are started following an extended shutdown, employees will be called back according to station and department requirements.

4.  None of the foregoing provisions shall apply to the President of the Union, who shall be retained so long as work, which they are qualified to perform, is available at their wage rate in their department. If they are not qualified to perform the work, which is available at their wage rate, they shall be assigned to other available work which they are qualified to perform.

**Unfair Discharge**

If the Union believes that any employee has been discharged unfairly, the Employer agrees, when called upon, to discuss the discharge through the Grievance Procedures herein provided for.

**Supervisors Promoted from Bargaining Unit**

1.  **Appointment to Supervisory Positions**

   Employees who receive permanent appointments to supervisory positions will be issued withdrawal cards from the Union as of the date of the appointment.

2.  **Voluntary Return of Supervisors to the Bargaining Unit**

   a.  Each permanent supervisor appointed before June 1, 1974, may at any time prior to June 1, 1975 voluntarily return to the bargaining unit job to which their adjusted appointed seniority entitles them. On and after June 1, 1975, such supervisors may not voluntarily return to the bargaining unit without surrender of all station and appointment seniority rights.

   b.  Each relief supervisor appointed as permanent supervisor on or after June 1, 1974 may voluntarily return to the bargaining unit at any time within the thirty (30) days after their appointment, and all station and appointment seniority rights acquired prior to



their appointment as supervisor shall be fully recognized. After such thirty-(30) day period, such supervisors may not voluntarily return to the bargaining unit without surrender of all station and appointment seniority rights.

3.    Involuntary Return of Supervisors to Bargaining Unit

    a.    Any permanent supervisor appointed before June 1, 1974, who is transferred back to the bargaining unit because of a permanent reduction in the supervisory force will be transferred to the job to which they are entitled based on their adjusted seniority except that their appointment seniority on that job will be (i) their adjusted appointment seniority, or (ii) an appointment seniority immediately junior to that of the most junior employee then within the group of regular incumbents in that job classification; whichever of (i) or (ii) calls for the lower seniority. For example, if such an employee is transferred back to Millwright Electrician, they will hold craft seniority below all employees then assigned to the Electrical Craft. Similarly, if they are transferred back to an Operations Department job they will have appointment seniority and station seniority below that of all then regular incumbents.

        Their appointment seniority rights on all other posted jobs will be junior to all other employees holding seniority rights to such jobs on date of return to the bargaining unit.

    b.    Any relief supervisor who is appointed permanent supervisor on or after June 1, 1974 and who is involuntarily transferred back to the bargaining unit because of a permanent reduction in the supervisory force within the three-(3) year period following their appointment shall have seniority rights as described in subparagraph a. above.

    c.    Any permanent supervisor who is involuntarily returned to a job within the bargaining unit for reasons or under circumstances not within subparagraphs a. or b. above, shall be transferred to a base rate job, and shall be credited with adjusted plant seniority.

    d.    Supervisors will not be transferred to positions under Union jurisdiction because of temporary plant shutdowns or temporary curtailment of the operations of any craft or station.

4.    No Union member will work as a relief supervisor.

5.    Definition of Adjusted Seniority

For all purposes of this subsection E., "adjusted seniority" is the seniority established by an employee while within the bargaining unit.

In the case of a supervisor who returns to a job within the bargaining unit, their plant, station, craft and appointment seniority dates shall, where appropriate, be recomputed by advancing such dates by the period of time during which the employee was not within the bargaining unit, and the seniority dates so computed shall be employee's "adjusted seniority" dates. These "adjusted seniority" dates may not be used for bidding on job postings for a period of 180 working days from date of return to the bargaining unit. During such 180 working-day period the employee, for job posting purposes, will be considered to have a seniority date which is the same date as their date of return to the bargaining unit.

SECTION XV

NEW MACHINERY, EQUIPMENT AND METHODS

Employer shall have the right to utilize new machinery and equipment during the term of this agreement and Union shall not interfere with such right. This right shall be subject to the following

provisions of this section.

1.  Prior to a different type of machinery or equipment being placed into operation, or the making of a basic change in a job, including a change in work method, technological or experimental change, Employer shall inform the Union of the rules, wages and working conditions Employer plans to establish for such operation and the approximate date they will go into effect. Such notice to the Union shall be made no less than ten (10) days prior to the change and where reasonably practicable to do so longer notice shall be given, but in no case more than sixty (60) days.

2.  At Union's request, a meeting with Employer shall be held following above notification to discuss the proposed rules, wages and working conditions. Unless otherwise agreed to beforehand, such meeting shall be restricted to not more than three (3) representatives of Union and three (3) representatives of Employer.

3.  In the event the Union deems that a different type of machinery or equipment has been placed into operation, or a basic change made in a job, including a change in work method, technological or experimental change, and the Employer has not followed the procedures established in B. 1. and 2., the Union may refer the issue directly to the Third Step of the Grievance Procedure.

The Employer's rules, wages and working conditions (except where modified by the Employer during the trial period as the result of experience gained during the trial period) shall stay in effect for a thirty-(30) working-day trial period. This trial period can be shortened or extended when mutually agreed to by both the Union and the Employer. The Union shall have the right to have its representative evaluate and study such operation during the trial period.

If at the end of the trial period the Union is dissatisfied with the rules, wages or working conditions, the Union may, within fifteen (15) days following the termination of the trial period, request a meeting with the Employer for the purpose of negotiating the open issues. If agreement cannot be reached, the Union may have the fairness of the rules, wages and working conditions reviewed by an Arbitrator, who shall be selected as provided in Section XX.

The Arbitrator shall review the rules, wages and working conditions to determine whether they are reasonable and fair as compared with the rules, wages and working conditions agreed to by parties for other jobs within Union's jurisdiction. If the Arbitrator decides that a change or changes in the rules, wages or working conditions is required in order to make them reasonable and fair under such standard, such change or changes shall be binding upon the parties, and any change in wages shall be made retroactive to the beginning of the trial period.

If, subsequent to the Arbitrator's decision, further changes or improvements are made in the operation of the machinery or equipment that affect the reasonableness and fairness of the rules, wages or working conditions, the Employer may modify the rules, wages and working conditions previously reviewed or established by the Arbitrator and establish a new trial period. Under these circumstances, and if the Union is dissatisfied with the new rules, wages and working conditions, the Union shall have the same procedures available as in the case of the first trial period.

## SECTION XVI

## MECHANIZATION OPTION

It is recognized that equipment or methods changes may result in the elimination of jobs or a decrease in the number of employees required to perform a given job. When a layoff is impending because of equipment or methods changes, a special early retirement option will be made available under the terms and conditions outlined in Paragraph B. below. This option is not available if an impending layoff is due to decreased melt, or decrease or change in sales requirements, or for any reason other than equipment or methods changes.



This option is available only to employees who have attained age 55 and who have completed thirty (30) full years of service.

1.  On the first day of any month during which equipment or methods changes will require a layoff, a notice will be posted on Employer's bulletin boards specifying the number of employees to be affected and the department(s) from which applications will be selected.

2.  Applications will be accepted from eligible employees within the department in which the equipment or methods change occurs for a period of fifteen (15) days after the posting of such notice.

3.  From applications so received a number of employees from the department in which the equipment or methods change occurs, equivalent to the number of employees who would otherwise be laid off (regardless of department from which layoff occurs) will be selected to receive this option.

4.  If insufficient applications for this option are received under Paragraphs 2. and 3. above, then additional applications will be accepted from eligible employees within the department from which the layoff occurs.

5.  If insufficient applications for this option are received under Paragraphs 2., 3., and 4. above, then additional applications will be accepted from eligible employees in other departments.

6.  From applications so received under Paragraphs 2., 3., 4. and 5. above, a number of employees equivalent to the number of employees who would otherwise be laid off will be selected according to plant seniority for special retirement with a monthly benefit (excluding pension plan benefits) of $100 from date of special retirement until attainment of age 65 or until 36 monthly payments have been made, whichever occurs first. Any employee selected for this option may elect to retire under the early retirement provisions of the pension plan or to defer their pension until attainment of age 65, but in either event such employee shall be considered as retired immediately upon commencement of the $100 monthly payment.

7.  If insufficient applications for this option are received, then the required number of employees will be laid off under Contract Section XIV C. which governs reduction in forces.

### SECTION XVII

### UNION SHOP

Only members in good standing in the Union shall be retained in employment. For the purposes of is section, "members in good standing" shall be defined to mean employee members in the Union who ider the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining :mbership. Non-members of the Union hired by the Employer must complete membership affiliation on immediately following the date of hire, and the Union agrees to accept said non-members into :mbership on the same terms and conditions generally applicable to other members. Upon written tice from the Union of failure on the part of any individual to complete membership in the Union as ove required or of failure to continue payment of dues to the Union, the Employer shall, within three days of such notice, discharge said employee.

### SECTION XVIII

### CHECK-OFF OF UNION DUES

The Employer agrees that it will deduct from the pay of each "on-roll" employee covered by this agreement, provided that a written and authorized assignment in the form hereafter provided is in

the possession of the Employer at the time of such deduction, Union initiation fees and membership dues, subject to the procedure as set forth in the succeeding paragraphs of this section.

It is agreed that membership dues and initiation fees shall be deducted from employees' pay as provided in the "Assignment of Wages" set forth in Paragraph G. below.

The total amounts so deducted pursuant to such assignments shall be transmitted to the Union by check drawn to the order of SWU #1 monthly after the deductions are made. Upon the issuance of such check and transmission of the same to the Secretary Treasurer of the Union, and the issuance of a receipt to the Employer by the Union, all responsibility on the part of the Employer shall cease with respect to any amounts so deducted.

It is agreed that the Employer and the Union will work out an arrangement mutually satisfactory by which the Employer will furnish the Business Agent of the Union a monthly record of those from whom deductions have been made, together with the amounts of such deductions. It is agreed that, if within thirty (30) days from the date the Employer has furnished such list to the Business Agent of the Union no claim of error is made, such list, as well as the amounts deducted, shall become final and conclusive for all transactions or deductions during the period of such list.

The Employer, having hereinbefore agreed to make dues collections for the Union, shall do so only as long as a person is actually employed by the Employer, and the Union hereby agrees that when an employee returns to work after a layoff or an absence for good cause the card authorizing deductions from the pay of such an employee shall set forth the amount to be deducted and the schedule of deductions in the event of arrearages in dues on the part of the employee. It is expressly understood that the Employer assumes no liability and shall not be liable for the collection or payment to the Union of any dues during any time that an employee is not actually working for the Employer and actually on the payroll of the Employer.

It is further agreed that the Employer shall not be held responsible in any cases where dues are not deducted through clerical error of the Employer or where employees have insufficient earnings to make such deductions, or where the Employer is not notified that such deductions should be made prior to the payday.

The form of the Assignment mentioned in A. above shall be as follows:

### ASSIGNMENT OF WAGES TO COVER CHECK-OFF OF UNION DUES AND INITIATION FEES

C&H SUGAR COMPANY, INC. (PAYROLL DEPARTMENT);

I hereby assign to SWU #1 (the Union), from wages earned or to be earned by me as your employee, following sums:

a.   In payment of my Union initiation fee, the sum of $      , to be paid from wages due me on the first payday on roll.

b.   A sum per month to be paid from the wages due me on the first and second payday of each calendar month, starting with day one of my employment, equal to the monthly membership dues uniformly required by the Union as a condition of retaining membership therein.

This assignment shall remain in full force and effect through my employment or until the nination of the Collective Bargaining Agreement between C&H and the Union.

The within assignment of wages to the Union is hereby substituted for any and all wage assignments riously executed by me.

te.................................................................................................................

.mber.............................................................................................................

.ne .................................................................................................................

# ................................................................................................................

.gnature .........................................................................................................

## SECTION XIX

## UNION REPRESENTATIVES

### Access to Premises

Officials and representatives of Union and its International shall be permitted to talk on the job with employees subject to this agreement for the purpose of ascertaining whether or not this agreement is being observed by all parties and to assist in handling grievances. This privilege shall be exercised so that no time is lost to the Employer unnecessarily. If the privilege extended by this clause is abused, the Employer may make it contingent upon permission first being granted by the Director - Personnel and Industrial Relations.

### Stewards

1. The Employer recognizes the right of the Union to designate Shop Stewards and alternates. The authority of Shop Stewards and alternates so designated by the Union shall be limited to, and shall not exceed, the following duties and activities:

    a. The investigation and presentation of grievances in accordance with the provisions of the collective bargaining agreement;

    b. The transmission of such messages and information which shall originate with, and are authorized by the local Union or its officers, provided such messages and information have been reduced to writing, or if not reduced to writing, are of a routine nature and do not involve work stoppages, slowdowns, refusals to handle goods, or any other interference with the Employer's business. Shop Stewards, after obtaining permission from their respective supervisors, shall be permitted to leave their respective stations for the purpose of handling grievances and other proper Union business relating to this agreement. Such permission shall not be unreasonably withheld, it being the parties' intent to resolve grievances as soon as possible. As soon as practicable, a Shop Steward will report to their supervisor the length of time used in handling the grievance. All time used by Shop Stewards in the handling of grievances during working hours shall be paid for by the Employer, it being understood, however, that such privilege will not be abused.

2. Union shall designate the appropriate number of Shop Stewards, up to a maximum of 30, who shall represent the union on plant premises.

3. Each Union representative shall function for the Union with the least possible interference with or interruption to their regular duties. They shall, however, be free to perform their Union representation in an independent manner and without fear that their individual relations with the Employer may be affected or jeopardized in any degree by any action taken by them in good faith in their representative capacity.

4. Union representatives shall not absent themselves from their job unless the performance of their job or jobs related to their job will not be impaired, and then only upon reporting out and in to their supervisor.

**Attendance At Grievances**

Officials and representatives of Union and its International may be present at all stages of the grievance procedure.

**Union Absences**

1. Employees, not exceeding three (3) in number, chosen by the Union to attend to Local Union business outside the plant, shall, with the permission of the management, be granted leave of absence without pay not exceeding thirty (30) days.

2. Employees, not exceeding three (3) in number, who are elected or appointed to a full-time position with the Local Union, shall be given written authority to be absent without pay for the period of such term of office or appointment. Upon one week's notice of any such employee's desire to again return to work for the Company, the employee shall be returned to the Company's employment without reduction in their seniority, status or pay except as such reduction may be made for all employees of comparable status who have not been absent under the terms of this provision.

**SECTION XX**

**GRIEVANCE PROCEDURE**

When differences or complaints arise between Employer and the Union, or between Employer and any employee or employees, concerning changes made in existing working conditions, the interpretation and application of this agreement, or a claimed violation of this agreement, there shall be no suspension of work on account of such dispute, but it shall be disposed of according to this Section. Grievances must be filed within a period of ten (10) days following the occurrence of the incident complained of, except where by mutual agreement, due to the importance of the grievance, the time limit is extended. An earnest effort shall be made to settle all such grievances immediately by each of the following enumerated steps of the grievance procedure, each enumerated step to be exhausted before resorting to the next:

**FIRST STEP:**

By presentation of the grievance to the supervisor of the aggrieved employee or employees in the presence of the appropriate Shop Steward and conference between such employee or employees, Shop Steward and supervisor who will endeavor to settle the grievance no later than twenty-four (24) hours after it has been called to their attention.

**SECOND STEP:**

If the grievance is not settled under the First Step, above, it shall immediately (and in no case later than forty-eight (48) hours after its disposition under such First Step) be submitted to the department manager concerned or one or more of their designated representatives. Within seventy-two (72) hours after the grievance is so submitted to them, the department manager concerned shall give to an appropriate Union representative their decision with respect to the grievance.

**THIRD STEP:**

If the grievance is not settled under the Second Step, above, it shall immediately (and in no case later than forty-eight (48) hours after its disposition under such Second Step) be submitted to the

Director - Personnel and Industrial Relations or a designated representative.  Employees or persons involved in a grievance may, upon request of either party, be called as witnesses, but not more than two (2) witnesses shall be called at a time, and the number of witnesses shall not be unreasonable.

Within seventy-two (72) hours after the grievance is so submitted to the Director - Personnel and Industrial Relations, the Director shall give to an appropriate Union representative a decision with respect to the grievance.  If the issue is not resolved upon conclusion of this Third Step, and the Union desires to further pursue the grievance, a representative of the Union shall reduce the grievance to writing.  Whereupon, the Director - Personnel and Industrial Relations will deliver to the Union a written decision with respect to the grievance.

When an appropriate Union representative alleges a violation of past practice, the grievance shall be immediately referred to the Third Step.  In those cases, within twenty-four (24) hours, the Director - Personnel and Industrial Relations shall give to an appropriate Union representative a decision.

## Employer Grievance

Any grievance which the Employer may have against the Union or any of its members shall be presented to the Union by the Director - Personnel and Industrial Relations or a designated representative.

In the event that any such grievance of the Employer is not satisfactorily adjusted within five (5) days after such presentation, or in the case of an alleged violation of Section XXI within twenty-four (24) hours after such presentation, the Employer may demand arbitration.

## Grievance Resolution Committee

1.  Any grievance arising under this agreement which has not been adjusted as outlined in Paragraphs A. or B. above (except violations of the provisions of Section XXI) may be submitted to the Grievance Resolution Committee.  Such Committee shall be composed of the Director - Personnel and Industrial Relations, the manager of the department in which the grievance originated, and two (2) members selected by the Union.

    This Committee will have the authority to settle all grievances submitted to it by whatever means it deems appropriate.

2.  Any grievance arising between Employer and Union which is not settled under Section XX A. or B. may be submitted to the Grievance Resolution Committee provided written Notice of Appeal is given no later than ten (10) days following the conclusion of the Third Step.  If given by the Employer, the notice shall be delivered to the Secretary-Business Agent of the Union at the Union's business office; if given by the Union, the notice shall be delivered to the Director - Personnel and Industrial Relations of the Employer at its Crockett refinery.  If Notice of Appeal is not given within the agreed time, the right of appeal shall be forfeited.

3.  If the grievance is initiated by the Employer, the Grievance Resolution Committee shall meet at the request of the Employer's Director - Personnel and Industrial Relations; if a grievance is initiated by the Union, the Grievance Resolution Committee shall meet at the request of the Union's Secretary-Business Agent.  A meeting of the Grievance Resolution Committee shall be requested within five (5) days from the date on which Notice of Appeal is given, otherwise the grievance shall be considered abandoned.

4.  The Grievance Resolution Committee shall meet within five (5) days after a meeting is requested by either party as herein provided, except that no meeting shall be held on Saturdays, Sundays or holidays unless by mutual consent.



If the Grievance Resolution Committee members selected to represent the party against whom the grievance is filed fail to meet within the agreed time, then the grievance as stated in Notice of Appeal shall be considered to be upheld and the complaining party entitled to the remedy claimed.

5.   If the Grievance Resolution Committee does not agree upon a settlement of the grievance, either party may demand mediation. Mediation will be conducted by American Intermediation Service. The party desiring mediation shall notify the other within fifteen (15) days after the conclusion of the Third Step, Grievance Resolution Committee meeting or the Employer's grievance presentation, as the case may be. Thereupon, the grievance shall be referred to the mediator. All costs of the mediation shall be borne equally by both parties.

6.   If mediation does not result in a settlement of the grievance, either party may demand arbitration as outlined in Paragraph D. below.

**Arbitration**

If a grievance shall not have been satisfactorily settled, either party may demand arbitration as follows:

The party desiring arbitration shall notify the other within fifteen (15) days after the conclusion of the Third Step, Grievance Resolution Committee meeting, or the Employer's grievance presentation, as the case may be. Thereupon, the grievance shall be referred for decision to the Arbitrator. The Arbitrator shall have the authority to make such decision and award as the facts and circumstances may warrant, subject to the limitations of this agreement, but the Arbitrator shall not add to, subtract from, alter or change the scope and terms of the agreement. The decision of the Arbitrator shall be final and binding upon the parties hereto, and the parties agree to abide by such decision. All costs of the Arbitrator (other than counsel fees) shall be borne equally by both parties.

All of the time limits set forth in this Section XX or elsewhere in this agreement relating to grievances are exclusive of Saturdays, Sundays and holidays and may be further extended by written consent and approval of both parties.

No claims (including claims for back wages) by the Union in behalf of an employee against the Employer shall be valid for a period prior to the date the grievance was first presented in accordance with the grievance procedure, unless the circumstances of the case made it impossible for the Union to know that there were grounds for such a claim prior to the date, in which case the claim shall be limited retroactively to a period of thirty (30) days prior to the date the claim was first presented. Notwithstanding the above, where a claim concerns whether the proper established rate is paid an employee, the claim may be made retroactively to the execution date of this labor agreement.

No decision of the Employer or of the Arbitrator in one case shall create a basis for a retroactive adjustment in any other case prior to the date of presentation of each such specific claim in accordance with the grievance procedure.

The Arbitrator shall be selected as follows:

Promptly following execution of this agreement, the Union and the Employer shall jointly request the Director of the Federal Mediation and Conciliation Service to nominate a panel of eight (8) Arbitrators. If any of these eight (8) is removed from the panel, then the Director will at that time designate such additional names as may be necessary to complete a panel of eight (8) Arbitrators. From the panel so designated Employer and Union shall each strike two (2) names, and the remaining names shall constitute the list from which the Arbitrator will be selected by lot until an available Arbitrator is procured. Except by mutual consent of the parties, no person shall be designated as Arbitrator in two (2) consecutive arbitrations.

Arbitration proceedings shall be commenced and concluded with all reasonable speed, it being the desire of the parties that prompt answers be secured to any questions submitted to arbitration. If the party demanding arbitration fails or refuses to proceed to arbitration within the forty-five (45) days following its arbitration demand, its grievance shall be considered abandoned, provided that if the arbitration hearing is delayed for a reason beyond its control, the arbitration shall be held within fifteen (15) days following the ending of such reason or be considered abandoned.

## SECTION XXI

### STRIKES, LOCKOUTS AND WORK STOPPAGE

There shall be no strike, lockout or work stoppage for the life of the Contract.

Refusal to cross a legitimate picket line shall not be deemed a violation of this agreement. A legitimate picket line is one established and maintained by SWU #1 or any other union, acting independently of the said local, about the premises of the Employer with whom it is engaged in a bona fide dispute over wages, hours or working conditions of employees of which it has been certified or recognized as the collective bargaining representative. Collusive picket lines, jurisdictional picket lines, hot cargo picket lines, secondary boycott picket lines, and demonstration picket lines, regardless of the union by which any such line is established, are not legitimate picket lines within the meaning of this agreement.

The Union will give the Employer seventy-two (72) hours' notice in writing of its intention to recognize a legitimate picket line in order to permit the Employer to safely terminate operations and sweeten off its plant.

## SECTION XXII

### PENSIONS

A pension agreement exists between the parties covering the period from June 1, 2003 to 12:00 midnight, May 31, 2006.

The Employer will provide a Profit Sharing Thrift Plan for its employees. All wages, including wages paid for overtime, will count for purposes of 401(k) deferrals.

## SECTION XXIII

### HEALTH AND WELFARE

A Health and Welfare Agreement exists between the parties covering the period June 1, 2003 to May ., 2006.

## SECTION XXIV

### GROUP LIFE INSURANCE

The Employer will provide Group Life Insurance to its employees to the same extent, in the same amounts, and subject to the same conditions as now provided (except as provided in Paragraph C. below).

Employees may opt to purchase additional life insurance coverage on a pre-tax basis.

The amount of group life insurance will be reduced 8% per year for those employees who continue to work beyond normal retirement age (age 65).

The Employer will provide employees who retire under the C& H Retirement Plan from September 1,

1955 through May 31, 1973 with life insurance coverage of $1,000 at no cost to employees. The Employer will provide employees retiring under the C and H Retirement Plan on June 1, 1973 or thereafter, life insurance coverage of $2,500 at no cost to employees.

## SECTION XXV

### REFINING OPERATIONS

The Employer will have the sole right to determine when and if the refinery will operate and at what rate of melt.

Notwithstanding Paragraph A. above, when the refinery is operated within any work week it will be operated for not less than five (5) days within such work week except in the following cases:

1.  When a recognized holiday falls within a work week, in which case the holiday shall be considered a day of refining operations.

2.  When operation of the refinery is prevented by causes beyond Employer's control. Examples of such causes are: inability of Employer to obtain Hawaiian raw sugar because of unfavorable weather conditions in Hawaii, strikes involving Hawaiian plantations, failures of equipment on Hawaiian plantations, strikes preventing loading, sailing or unloading of vessels carrying Hawaiian raw sugar, inability of Employer to obtain fuel, water or supplies required for operation of its refinery, failure of major refinery equipment which totally prevents operation of the refinery.

The Employer will make every effort to operate the refinery continuously on a year round basis. In order to do so Employer will, when necessary, reduce the melt to the lowest level it deems economically feasible, laying off employees not needed under the provisions of Section XIV C. 1. and 2. When, in Employer's judgment, it is not economically feasible to operate the refinery it will be shut down for a period of not less than one or more full work weeks. In case of such a shutdown, employees will be laid off and called back as station and department conditions require and according to past practice.

Notwithstanding anything herein or in past practice to the contrary, Employer shall have the right to cancel not more than two (2) regularly scheduled operating days in any operating period, subject to the following limitations: (a) the total number of operating days cancelled under this paragraph within any calendar year shall not exceed six (6); (b) the total number of operating periods within any calendar year in which operating days are cancelled under this paragraph shall not exceed three (3); and (c) operating days shall not be cancelled under this paragraph within any two (2) consecutive operating periods. Employer's rights under this paragraph shall be in addition to its rights to determine when and if the refinery will operate as otherwise provided herein or by past practice. Holiday pay shall be paid as otherwise provided herein with respect to any holiday occurring during an operating period when refinery operations are curtailed under this paragraph.

Exhibit "C," attached hereto, sets forth the conditions under which employees are eligible for unemployment insurance benefits when laid off under the provisions of Paragraph D. above.

## SECTION XXVI

### SUPPLEMENTARY UNEMPLOYMENT COMPENSATION PLAN

Any employee with plant seniority of one (1) year or more who is laid off because of a plant shutdown other than a shutdown described in Paragraph B. below shall, subject to the provisions of this Plan, have any state unemployment insurance compensation benefits to which they are eligible supplemented by the Employer as follows:

1.  For the first two (2) weeks of unemployment within any benefit year, no supplemental benefits.

27

2.  For the third through the 27th weeks of unemployment within any benefit year, a supplemental benefit which (before deductions therefrom for Federal income taxes withheld, social security contributions, and California Unemployment Disability Insurance, as required by law), when added to their state benefit for such weeks, shall equal 65% of their regular take-home pay.

3.  For weeks of unemployment thereafter, within the benefit year, no supplemental benefits.

Supplemental benefits, shall not be paid during plant shutdowns caused by any cause beyond Employer's control.  Examples of such causes are listed in Paragraph B. 2. of Section XXV.

Supplemental benefits shall not be payable under this Plan as to any week of unemployment for which state benefits are not payable, nor after twenty-seven (27) weeks of layoff from the Employer within a benefit year.

No supplemental benefits shall be payable under this Plan until such time as, under California law, supplemental benefits as provided by this Plan may be paid without affecting the entitlement of recipients to state benefits.  Each of the parties hereto shall use its best efforts to urge and assist in the enactment of appropriate laws of the State of California to enable the payment of supplemental benefits as herein provided without affecting the entitlement of recipients to state benefits.

As used herein:

1.  "State benefit" means the full amount of unemployment compensation benefits payable to an employee under the California Unemployment Insurance Program for a week of unemployment, or which would have been payable for such week but for the employee's receipt of wages or compensation from a person other than the Employer.

2.  "Benefit year" shall have the same meaning as under the California Unemployment Insurance Program.

3.  An employee's "regular take-home pay" is the rate of the job held immediately prior to the plant shutdown, as shown by "Exhibit B," reduced by all withholdings and taxes required or imposed by law and all amounts which the employee has authorized to be deducted from their pay for employee benefit plans.  In the case of daily rated jobs, pay shall be computed on the basis of a forty-(40) hour week.

4.  A "week of unemployment" under this Plan shall coincide with a week of unemployment as determined for purposes of the California Unemployment Insurance Program.

Nothing contained in this Section XXVI is intended to modify any other provision of this agreement.

SECTION XXVII

WORKERS' SAFETY COMMITTEE

The Employer will continue its Workers' Safety Committee as in the past with representation from each department in which there are SWU members as follows:

|  |  |
|---|---|
| Operations Department | 2 Members |
| Maintenance Services Department | 2 Members |
| Technical Operations Department | 1 Member |
| Industrial Relations Department | 1 Member |
| Stores Section | 1 Member |

The Union will have the option of selecting three (3) members of this committee as follows:

> One of the Operations Department members
>
> One of the Maintenance Services Department members
>
> One of the members on a rotational basis from either Technical Operations, Industrial Relations or Stores Section

If for any year the Union does not exercise its option in the selection of any or all of the three (3) members provided for in B. above, the members of the Safety Committee will be selected by the departments, as in the past.

## SECTION XXVIII

## DEFINITION OF EMERGENCY

For purposes of this agreement, the word "emergency" is defined as "a sudden, generally unexpected occurrence or set of circumstances demanding immediate action."

## SECTION XXIX

## TERM OF THIS AGREEMENT

This agreement shall be effective June 1, 2003 and shall remain in full force and effect until 12:00 midnight, May 31, 2006.

At least sixty (60) days prior to June 1, 2006, both parties shall submit written proposals for amendment or renewal of this agreement and negotiations shall be commenced forthwith.

The Union agrees to give the Employer and the Employer agrees to give to the Union written notice at least three (3) regularly scheduled melt days before any strike or lockout becomes effective. This notice shall specify the effective time of the contemplated strike or lockout. This obligation shall survive the term of this agreement.

IN WITNESS WHEREOF the parties hereto have executed this Agreement effective June 1, 2003.

SUGAR WORKERS UNION NO. 1                C&H SUGAR COMPANY, INC.
U of NA - AFL-CIO

Signed:                                                    Signed:

/s/ Joe Palacio _____          /s/ Stephen L Kowalski _____

/s/ Surinder M. Bhanot _____            /s/ James W. Dudley _____

/s/ Leroy J. Garcia _____           /s/ Gaylord B. Harrah _____

/s/ Thomas E. McClure _____             /s/ Kyle C. Stradleigh _____

/s/ Gregory A. Lindke _____           /s/ Thomas A. Walz _____

/s/ Kevin J. Abel _____           /s/ Jagtar S. Basi _____

/s/ Larry W. Williams _____

EXHIBIT "A"

PERSONAL TIME OFF

**Personal time off may be granted with no questions asked.**



## EXHIBIT "B"

### TO COLLECTIVE BARGAINING AGREEMENT

### EFFECTIVE JUNE 1, 2003

### SINGLE RATE DAILY RATED CLASSIFICATIONS

**$16.14 Per Hour**

Packaging Laborer
Process Laborer
Stores Laborer

**$16.32 Per Hour**

Power Station Trainee

**$17.39 Per Hour**

Laboratory Technician - Level 1
Packaging Technician - Level 1
Process Technician - Level 1
Security - Level 1
Stores Technician - Level 1

### SINGLE RATE BIWEEKLY RATED CLASSIFICATIONS

**$18.47 Per Hour**

Laboratory Technician - Level 2
Packaging Technician - Level 2
Process Technician - Level 2
Security - Level 2
Stores Technician - Level 2

**$19.54 Per Hour**

Laboratory Technician - Level 3
Packaging Technician - Level 3
Process Technician - Level 3
Stores Technician - Level 3

**$20.98 Per Hour**

First Class Journeyman (all crafts)
Laboratory Technician - Level 4
Packaging Technician - Level 4
Process Technician - Level 4
Stores Technician - Level 4
Toolkeeper

**$22.05 Per Hour**

Laboratory Technician - Level 5
Maintenance Department Millwright
Millwright (all crafts)
Packaging Technician - Level 5
Process Technician - Level 5

**$22.60 Per Hour**

Centrifugal Specialist
Maintenance Department Specialist
Millwright Specialist (Maint. Dept.)
Operations Department Specialist
Packaging Specialist
Pan Specialist
Power Station Operator Specialist
Process Specialist

## DAILY RATED RATE RANGE CLASSIFICATIONS

### Maintenance Services Department

| | | | Hourly Rate |
|---|---|---|---|
| **General Apprentice (all crafts)** | - | **2d Class Helper** | $ 16.32 |
| | - | **1st Class Helper** | 16.67 |
| | - | **5th Class Improver** | 17.21 |
| | - | **4th Class Improver** | 17.75 |
| | - | **3d Class Improver** | 18.29 |
| **Millwright Steps (all crafts)** | - | **3d Class Improver** | $ 18.29 |
| | - | **2d Class Improver** | 18.83 |
| | - | **1st Class Improver** | 19.37 |
| | - | **3d Class Journeyman** | 19.90 |
| | - | **2d Class Journeyman** | 20.44 |

## BIWEEKLY RATE RANGE CLASSIFICATIONS

### Maintenance Services Department

| | | | Hourly Rate |
|---|---|---|---|
| **Power Station Operator B** | - | **1st step** | $ 17.21 |
| | - | **2d step** | 17.75 |
| | - | **3d step** | 18.29 |
| | - | **4th step** | 18.83 |
| | - | **5th step** | 19.37 |
| | - | **top step** | 19.90 |
| **Power Station Operator A** | - | **1st step** | $ 20.98 |
| | - | **2d step** | 21.52 |
| | - | **top step** | 22.05 |

### Emergency Response Department

| | | | Hourly Rate |
|---|---|---|---|
| **Fire Marshal** | - | **1st step** | $ 16.32 |
| | - | **2d step** | 16.67 |
| | - | **3d step** | 17.21 |
| | - | **4th step** | 17.75 |
| | - | **5th step** | 18.29 |
| | - | **6th step** | 18.83 |
| | - | **7th step** | 19.37 |
| | - | **8th step** | 19.90 |
| | - | **9th step** | 20.44 |
| | - | **top step** | 20.98 |