EXHIBIT "C"

A Work Sharing Program, administered through the State of California, will be in effect for the ration of this contract.

This program provides for payment of unemployment insurance benefits equal to 20% of the weekly nefit an employee is entitled to for each day of layoff after they have established a benefit year as fined by the State of California Employment Development Department (EDD).

Under the Company-Union work sharing agreement, the employee's benefit-year-beginning (BYB) date the program will be established by the employee's first reduced workweek in a 12-month period as termined by the California Employment Development Department (EDD).

The claim forms will be initiated by the Industrial Relations Department and coordinated with the nployment Development Department of the State of California based on their guidelines and criteria.

JGAR WORKERS UNION NO. 1
SIU of NA - AFL-CIO

gned:

      /s/ Joe Palacio

      /s/ Surinder M. Bhanot

      /s/ Leroy J. Garcia

      /s/ Thomas E. McClure

      /s/ Gregory A. Lindke

      /s/ Kevin J. Abel

      /s/ Larry W. Williams


ALIFORNIA AND HAWAIIAN SUGAR COMPANY, INC.

gned:

      /s/ Stephen L Kowalski

      /s/ James W. Dudley

      /s/ Gaylord B. Harrah

      /s/ Kyle C. Stradleigh

      /s/ Thomas A. Walz

      /s/ Jagtar S. Basi

# INDEX

## 1998 – 2003 CONTRACT

**Subject**                                                              **Page**

Arbitration...................................................................................................

Back-to-Back Differential...........................................................................

Biweekly Pay ...............................................................................................

Check-Off .....................................................................................................

Christmas Award .........................................................................................

Cost-of-Living Adjustment .........................................................................

Coverage of Contract ...................................................................................

Curtailed Schedule .......................................................................................

Days of rest, definition of ............................................................................

Differentials
      Lunch period differentials.....................................................................
      Shift differential .....................................................................................

Disabled Employees, reasonable accommodation for..................................

Discharge, unfair .........................................................................................

Double Time .................................................................................................

Employment, Advancement and Retention
      Governing Policy ....................................................................................

Emergency, definition of .............................................................................

Emergency Work After Midnight ................................................................

Exhibit "A", Personal Time Off ...................................................................

Exhibit "B" ...................................................................................................

Exhibit "C", Work Sharing Program ...........................................................

Extended Plant Shutdowns, work during......................................................

Five hours without a meal .............................................................................

Funeral Leave ...............................................................................................

Grievance Procedure.....................................................................................

Group Life Insurance ...................................................................................

**Subject**                                                                                     **Page**

**Health and Welfare** ............................................................................

**Holidays**
    **Designated**............................................................................
    **During vacation** ...................................................................
    **Holidays on Sunday** ............................................................
    **Holidays on Saturday**..........................................................
    **Pay for** ...................................................................................
    **Personal Holiday**.................................................................
    **Work on**................................................................................

**Layoffs**..........................................................................................

**Meal Allowance** ..........................................................................

**Meal Periods** ...............................................................................

**Mechanization Option**................................................................

**New Employee Rate** ...................................................................

**New Machinery, Equipment and Methods**..............................

**Occupations covered by contract**............................................

**Overtime**
    **Assignment of**......................................................................
    **Cancellation** ........................................................................
    **Errors in Assignment of** ......................................................
    **Guarantee**............................................................................
    **Notice required** ...................................................................
    **No pay if not performed** ......................................................
    **Pay for**..................................................................................
    **Late start-up due to holiday**................................................
    **Rotation and Equalization of** ..............................................
    **Voluntary** .............................................................................

**Pensions**......................................................................................

**Personal Time Off** ......................................................................

**Premium Pay** ...............................................................................
    **Computation of**....................................................................

**Probationary Period** ...................................................................

**Promotions** ..................................................................................

**Recess Periods** ............................................................................

**Reduction in Forces**....................................................................

**Subject**                                                     **Page**

**Refining Operations** ................................................................

**Report Pay** ................................................................

**Return to Work, notice of** ................................................................

**Safety Committee** ................................................................

**Schedules** ................................................................
        **Changes of** ................................................................
        **Definition** ................................................................
        **Types** ................................................................

**Seniority** ................................................................
        **Adjusted, definition of** ................................................................
        **Appointment** ................................................................

**Severance Pay** ................................................................

**Shift Changes** ................................................................

**Shift Differential** ................................................................

**Shutdowns, work during** ................................................................

**Staggered hours** ................................................................

**Stewards**
        **Duties** ................................................................
        **Number** ................................................................

**Strikes, Lockouts and Work Stoppages** ................................................................

**Successor Clause** ................................................................

**Supervisors Promoted**
        **From Bargaining Unit** ................................................................
                **Appointment to** ................................................................
                **Return to Bargaining Unit** ................................................................
                **Involuntary** ................................................................
                **Voluntary** ................................................................
                **Status of Relief or Temporary Supervisor** ................................................................

**Supervisors Performing Union Work** ................................................................

**Supplementary Unemployment Compensation** ................................................................

**Term of Agreement** ................................................................

**Two-hour Notice** ................................................................

**Unfair Discharge** ................................................................

**Subject**                                                                                                    **Page**

**Union Representatives**...................................................................................................
     **Access to Premises** ...............................................................................
     **Absence of** ................................................................................................

**Union Shop** ........................................................................................................

**Vacations**.........................................................................................................
     **Accumulation** ........................................................................................
     **Adjustments** ..........................................................................................
          **Leave of Absence**............................................................
          **Personal Time Off**............................................................
          **Sickness**..........................................................................
          **Shift Differential** ...........................................................
     **Union Action** .........................................................................................
     **Eligibility**..............................................................................................
     **Holidays during** ...................................................................................
     **Termination Allowance** .......................................................................
     **Vacation Account** ................................................................................
     **Vacation Allowance**.............................................................................
     **Vacation Periods**.................................................................................

**Wages** ..............................................................................................................
     **Cost-of-Living Adjustment** ................................................................
     **New Employee Rate** ...........................................................................

**Wage Rates** .....................................................................................................

**Work Day**........................................................................................................

**Work Covered by Contract** ............................................................................

**Work Schedules** .............................................................................................

**Work Week**......................................................................................................

**Workers' Safety Committee** ...........................................................................

# HEALTH AND WELFARE AGREEMENT

## (As Amended June 1, 2003)

C&H Sugar Company, Inc. herein called "C&H", and Sugar Workers Union #1, Seafarers International Union of N.A., AFL-CIO, herein called "SWU", do hereby agree as follows:

## SECTION I – WAGE INDEMNITY PLAN

1. ### Coverage

   Each employee of C&H who is employed within the bargaining unit represented by SWU and who has six or more months of continuous service as an on-roll employee of C&H shall be a covered employee under this Plan, provided that an employee who is absent from work because of disability at the time of completion of six months' continuous service as an on-roll employee shall not be covered under this Plan until return to full-time active work. All costs of the Plan shall be borne by C&H.

2. ### Wage Indemnity Benefits

   Subject to the limitations and exclusions hereinafter stated, each covered employee who is unable to work because of disability shall be paid wage indemnity benefits which shall indemnify 100% of lost regular earnings for the first three regular working days during a disability, including related disabilities (plus any fractional day at onset of the disability) and 80% of regular earnings lost thereafter.

3. ### Limitations and Exclusions

   Wage indemnity benefits are subject to the following limitations and exclusions:

   a. Wage indemnity benefits for the first three regular working days lost because of a disability or related disabilities (plus any fractional day at onset of disability) shall be payable only to employees on C&H's biweekly payroll.

   b. Wage indemnity benefits shall be limited to a maximum period of 52 weeks for any one disability or related disabilities.

   Wage indemnity benefits payable with respect to the fourth full day and subsequent regular working days lost because of a disability or related disabilities shall be reduced by any workers' compensation, unemployment compensation disability, or Social Security disability

benefits for which an employee may be eligible for the same period of disability.

d. An employee disabled while on vacation, or during a leave of absence other than military leave, or while not working because of a temporary general shutdown of C&H's refinery (including a work stoppage), shall not be eligible for wage indemnity benefits until the expiration of such vacation, leave of absence or shutdown if the employee is on C&H's biweekly payroll; or until three regular working days have elapsed after the expiration of such vacation, leave of absence, or shutdown if on C&H's daily payroll.

e. Wage indemnity benefits shall be payable with respect to the fourth full day and subsequent regular work days lost because of a disability only if the disabled employee is under the care of a physician during the full period of such absence from work.

f. If a disabled employee receiving wage indemnity benefits is individually laid off for lack of work, wage indemnity benefits shall, subject to any other limitations or exclusions herein stated, terminate upon recovery from the disability or upon the 90th day from the date of layoff, whichever first occurs.

g. Except as provided by paragraph "f." above, the coverage of any employee individually laid off for lack of work shall be suspended until such time as the employee returns to work for C&H, provided, however, that if any such employee does not return to work for C&H within six months from the date of layoff, then coverage under the Plan shall thereupon terminate.

h. Coverage under the Plan shall be suspended during leave of absence for military service and following 52 weeks of one disability or related disabilities, and shall not be resumed until the employee returns to work for C&H.

i. No wage indemnity benefits shall be allowed where the disability is directly caused by, or results from, any of the following conditions:

(1) Intoxication, chronic alcoholism, or the immoderate use of stimulants or narcotics.
(2) Wrongful participation in any fights.
(3) War or any act of war.
(4) Intentionally self-inflicted wounds.

j. No wage indemnity benefits shall be payable unless the employee-claimant authorizes C&H's Plan administrator to

2

make such examinations or investigations as may be necessary to confirm the fact and cause of disability.

k. No wage indemnity benefits shall be payable with respect to any period of disability during which an employee refuses or fails to follow a course of treatment which, if followed, would facilitate recovery.

l. If an employee has been placed in the Absentee Control Program as described in the attached Exhibit "A" (Attendance Improvement Program), wage indemnity benefits shall be limited as provided in Step 2. or Step 3. of the Absentee Control Program.

4. **Administration**

a. If a covered employee is disabled and eligible for wage indemnity benefits under this Plan, the employee (or someone acting on their behalf) shall promptly, but in any case within 30 days of onset of the disability, apply for benefits on disability report forms as provided by C&H. oenefits are claimed with respect to the fourth or subsequent days of absence from work, the employee must submit a physician's certificate, at such time or times as requested by C&H, certifying to the fact that the employee was disabled and under the treatment of the certifying physician during the full period of such absence from work.

b. In all cases, including claims for benefits with respect to the first three full working days within a period of disability, C&H shall have the right to require reasonable proof of disability including, at its discretion, the submission of a physician's certificate attesting to the disability and the examination of the employee by a physician designated and paid by C&H. In the event of disagreement between an employee's physician and the physician designated by C&H as to the fact of an employee's disability, the Alameda-Contra Costa Medical Association will be asked to designate a panel of physicians from which one physician will be selected by lot by a representative of C&H and a representative of SWU to examine the employee and make the final determination as to whether or not the employee is disabled. The cost of such examination shall be borne by C&H.

5. **Termination**

An employee's coverage under this Plan shall terminate upon termination of employment within the class of employees covered by this Plan.

6. **Miscellaneous**

a. If C&H determines that an employee eligible for benefits under this Plan is unable to care for their affairs because of illness or accident or mental incompetence, or if such employee is unable to give a valid receipt for any benefit payment due under the Plan, any payment due (unless prior claim therefore shall have been made by a duly qualified guardian or other legal representative) may be paid by C&H to the legally appointed guardian or other legal representative of such employee, or to a spouse, parent, brother, sister or other person or institution to which such employee is legally obligated to pay them, in the judgment of C&H, providing for the care and maintenance of such employee. Any such payment shall be a payment for the account of the employee and shall be a complete discharge of any liability of C&H under this Plan.

b. No covered employee shall have any power to assign, transfer, encumber, borrow on the security of any benefits payable under the Plan, or to anticipate any payment under the Plan, and any attempt to so assign, transfer, pledge, encumber, commute, or anticipate shall be void, nor shall any right, benefit, or payment under the Plan be in any manner subject to alienation, sale, transfer, levy, attachment, assignment, pledge, encumbrance, or legal process to enforce payment of any kind against C&H or the employee, provided, however, that C&H shall deduct from such benefits any employee contributions required of the employee under the Hospital and Medical Indemnity Plan provided for by Section II of this agreement.

7. **Definitions**

a. "Disability" means a sickness or accidental bodily injury which prevents performance of full-time work for C&H, and the term "Disabled" shall apply to employees thus unable to perform full-time work for C&H.

b. "Regular earnings" means an employee's stated hourly wage rate in effect at onset of disability as shown on the payroll record (or the hourly equivalent of the stated biweekly wage rate) on a 5-day-workweek basis, excluding

4

any differentials because of temporary assignment or shift assignment.

c. "Physician" means:

(1) The holder of a degree of doctor of medicine and license to practice medicine in the state in which they are practicing; or

(2) The holder of a degree of doctor of dental surgery and license to practice dental surgery in the state in which they are practicing; or

(3) The holder of a degree of doctor of osteopathy and license to practice as physician and surgeon in the state in which they are practicing; or

(4) The holder of a degree of doctor of podiatry and license to practice as physician and surgeon in the state in which they are practicing.

d. An employee's "continuous service" begins with the first day of full-time employment by C&H within the current period of such employment, and shall include time absent from work because of disability, vacation, leave of absence, temporary plant shutdown (including work stoppage), and individual layoff of a duration of six months or less. No period of employment which was ended by termination of employment shall be considered continuous service.

e. "Termination of employment" occurs when an employee leaves the employment of C&H for whatever cause, except that absence from work because of disability, vacation, leave of absence, temporary plant shutdown (including work stoppage), or individual layoff of six months or less duration shall not constitute a termination of employment.

f. "Plan" and "the Plan" mean the Wage Indemnity Plan set forth in this section.

g. An employee is on C&H's "biweekly payroll" if they have completed five years of continuous service as an on-roll employee or if they hold a job listed under the caption "Single Rate Biweekly Rated Classifications" or "Biweekly Rate Range Classifications" in Exhibit "B" to the then current collective bargaining agreement between the parties. All other employees are on C&H's daily payroll.

    **h.** "Plan administrator" means C&H's Employee Benefits
    Committee.

## SECTION II – HOSPITAL AND MEDICAL INDEMNITY PLAN

1. a.  For the purpose of providing group medical and hospital
coverage for each eligible employee represented by SWU
No. 1 (participant) and certain of their dependents, C&H
shall provide sufficient funding, in addition to the
contributions of the participants, for the provision of such
coverage as described in the attached Exhibit "B".
Payment will be made for each participant within the
bargaining unit as of the first day of the month coincident
with or following date of hire, provided that no such
payments shall be made with respect to any participant
who, on such date, is on individual layoff for lack of
work, or who is disabled.

   b. In addition to the monthly funding provided for in
paragraph a. above, C&H shall bear all the administrative
expenses of the Plan.

2.   Each participant of the Plan shall contribute in the amount of
$20.00 (pretax) per payday. C&H is expected to collect such
contributions by appropriately authorized payroll deduction from
wages payable to participants represented by SWU. In the event of
failure to collect a participant's contributions by payroll deduction
because of a temporary absence from work due to an extended plant
shutdown (including work stoppage) then contributions for such
period may be collected by payroll deduction during successive pay
periods immediately following the employee's return to work.

3.   Effective April 10, 1992 (date 1992 contract was ratified) all
employees hired within the bargaining unit represented by the SWU
must have fifteen (15) years of continuous service immediately
preceding retirement in order to be eligible for post retirement
medical benefits.

## SECTION III

1. An Attendance Improvement Program as described in the
attached Exhibit "A" was established effective June 1, 1989,
amended June 1, 1992, and further amended June 1, 1995.

2. In addition to all other benefits provided by this agreement,
participants on C&H's biweekly payroll who are unable, because
of their work schedule, to make necessary medical, optical or
dental appointments on their own time without unreasonable

hardship, shall, with the prior approval of their department manager, be permitted to make such appointments during their scheduled working hours without loss of pay.

3. This agreement shall be in effect for a term commencing 12:01 a.m., June 1, 2003 and ending 12:00 Midnight, May 31, 2006. There shall be no strike or lockout during the term of this agreement over any Health and Welfare issue. At least 60 days prior to June 1, 2006, SWU and C&H shall submit written proposals for the amendment or renewal of this agreement, and negotiations shall be commenced forthwith. If SWU strikes for any reason for a period in excess of 60 calendar days, then C&H may elect to discontinue the payments called for by this agreement for the benefit of participants and their dependents which would otherwise be payable during or with respect to the period such strike exceeds 60 calendar days, but such right of C&H to discontinue payments shall not apply to payments made for the benefit of retired participants.

**IN WITNESS WHEREOF** the parties hereto have executed this

Agreement this _____ day of_____

2003.

SUGAR WORKERS UNION NO. 1,          C&H SUGAR COMPANY, INC
S.I.U. of N.A., AFL-CIO

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____

Prepared:  8/22/03
A:health2003.swu.doc

EXHIBIT "A"

ATTENDANCE IMPROVEMENT PROGRAM

An <u>Attendance Improvement Program</u> consisting of an <u>Absentee Control Procedure</u> and an <u>Attendance Incentive Plan</u> was established effective June 1, 1989, amended June 1, 1992, and further amended June 1, 1995. This program is intended to provide guidelines, procedures and incentives to insure maximum attendance by all employees. The program consists of the following:

## ABSENTEE CONTROL PROGRAM

In an effort to address the serious problem of absenteeism without adversely affecting employees who do not have excessive absenteeism, following is a 4-step process.

1.  A counseling session will be conducted with employees who have demonstrated excessive absenteeism. The counseling session (Step 1) will include: the employee, a representative of the Company and a representative of the SWU #1 unless the employee objects to representation. In all cases, the employee will be given a copy of their absentee record.

2.  If after the counseling session the employee's attendance does not improve, a warning letter may be issued to the employee. The receipt of the warning letter will then place the employee at Step 2 and limit them to 48 hours of wage indemnity benefits (sick pay) at 100% for the next 12 months.

3.  If an employee exceeds 48 hours at any time during the 12-month period at Step 2, they will be placed at Step 3 and will not be entitled to wage indemnity benefits at 100% until such time that they have had twelve (12) months of perfect attendance and are eligible to have the warning letter removed from the file.

4.  Any employee who is removed from this program and within two years following date of removal again has unsatisfactory attendance will be counseled. If unsatisfactory attendance continues after counseling, the employee will go directly to Step 3.

Disability absence includes: short-term illness absence, long-term illness absence, non-industrial injury and industrial injury. The following absences will not affect perfect attendance: medical and dental appointments, P.T.O., jury duty, union business, funeral leave and military reserve duty.

All employees who have warning letters for absenteeism will have their letters purged from their files at the end of 12 months of perfect

attendance.  If during the 12 months the employee's only absence is an industrial injury of one occurrence, or the Company doctor sends the employee home against the employee's wishes, this absence will not disqualify the employee from removal of the warning letter from their file.  An employee on a warning letter can request PTO (unpaid) for one short-term illness of up to 3 days, in lieu of an illness absence, once during the twelve months following receipt of a warning letter.

## ATTENDANCE INCENTIVE PLAN

1. Effective June 1, 1995 the basis against which cost reductions are measured is $465,000 per year.

2. This base will not be adjusted up or down during the term of this contract.

3. Bonuses will be paid to employees who have had three days of illness absence or less during the June 1 to May 31 period each year.

4. Cost reductions resulting from reduced absenteeism will be shared with eligible employees, as defined in 6. below on a 50-50 basis.

5. The following point system will be used to distribute 50% of achieved savings:

   | | |
   |---|---|
   | 0 day illness absence | = 8 points |
   | 1 day illness absence | = 6 points |
   | 2 day illness absence | = 4 points |
   | 3 day illness absence | = 2 points |

6. The points at each level will be multiplied by the number of eligible people to arrive at a total number of points for the eligible group.

7. The 50% savings available for distribution will be divided by the total points arrived at under 6. above to arrive at a dollar per point.

8. The dollar per point will be multiplied by the points outlined under 5. above to arrive at the individual award.

A:exhibitA98.swu.doc

2

**EXHIBIT "B"**

**C&H – SWU EMPLOYEES' BENEFIT PLAN**

**SUMMARY OF COVERAGE**

**(As Amended June 1, 1998)**

## HEALTH PLANS

Health plans generally described as those listed below are provided for participants and dependents.

1) PPO/Indemnity Medical Plan with Vision
2) Open Panel HMO with Vision
3) Closed Panel HMO with Vision
4) Network Dental Plan
5) Dental Indemnity Plan

Effective June 1, 1998, Dental Indemnity Plan will be amended to provide for prosthodontic benefits at 80%.

In the event underwriting changes for a Plan(s) listed above, Plan benefits agreed upon will be maintained.

### New Hire Retirement Medical

All new hires must have 15 years of continuous service immediately preceding retirement in order to receive post retirement medical benefits.

### Option to Have Coverage

An employee may opt out of benefits coverage if they are covered under another plan; i.e., spouse's plan. No employee contribution would be deducted.

### Dual Coverage

There is no dual coverage. A husband and wife both employed by C&H would be covered under the same plan; i.e., one would be a dependent of the other. Only one would pay an employee contribution.

Prepared: 7/24/98
A:exhibitB98.swu.doc

C&H Sugar Company, Inc. (the "Company") and Sugar Workers Union No. 1, S.I.U.N.A. (the "Union") agree as follows:

## I. ECONOMIC ISSUES

1. Except as hereinafter provided, the collective bargaining agreement between the Company and the Union, dated June 1, 2003 as amended by the settlement agreement dated **and ratified on June 15, 2006,** is adopted effective June 1, 2006, as the collective bargaining agreement between the parties until 12:00 midnight May 31, 2009.

2. All full-time, non-probationary employees on the payroll effective June 1, 2006, shall receive a one-time ratification **payment** in the gross amount of $2000.00 **in lieu of a wage increase for the first year of the Agreement.** This bonus shall not be part of the employee's regular rate. (Probationary employees as of June 1, 2006 shall be entitled to this bonus if they successfully complete their probationary period.)

3. Basic wage rates in effect on May 31, 2007 shall be increased by 3% effective June 1, 2007.

4. Basic wage rates in effect on May 31, 2008 shall be increased by 3% effective June 1, 2008.

5. Modify Section X Differentials,
   - A.1. to "Shift employees shall receive a fixed daily shift differential of $3.00 when working the 3:30pm – 11:30pm shift and $4.50 when working the 11:30pm – 7:30am shift." **Note : Shift employees working the 7:30a.m. – 3:30p.m. shift will be eligible for shift differential pay if they stay over into the 3:30p.m. – 11:30p.m. shift or work overtime hours prior to the start of their shift. Shift employees working the 3:30p.m. – 11:30p.m. shift will not be eligible for shift differential pay for any hours worked prior to the beginning of their shift. Shift employees working the 11:30p.m. – 7:30a.m. shift will not be eligible for shift differential pay for any hours worked beyond 7:30a.m.**

6. The current reimbursement for the purchase of safety shoes will be increased from $80 to $100.00 per year.

7. The pension agreement covering active employees is extended through May 31, 2009.

8. Through May 31, 2009 the Company will provide a $100 offset on the same basis as the prior collective bargaining agreement (June 1, 2003 – May 31, 2006) to employees retiring during the term of the new collective bargaining agreement.

9. The Company and the Union recognize that the current Health and Welfare Agreement is in need of revision, and that it will take substantial time and discussion to reach an agreement on the needed changes. Accordingly, the parties agree to meet and discuss this subject for a 90 day period following ratification of

Effective August 1, 2006, the employees' $20 per pay period contribution toward health, dental and vision premiums shall be revised so that the Company shall pay 94% toward the cost of monthly premiums and the employees shall pay the remaining 6%.

Effective June 1, 2007, the Company shall pay 93% toward the monthly premiums and the employees shall pay the remaining 7%.

Effective June 1, 2008 and continuing thereafter the Company shall pay 92% toward the cost of monthly premiums and the employees shall pay the remaining 8%.

## II. OPERATIONAL ISSUES

1. Change Exhibit "A" to read :
   - "When operating conditions permit granting it, an employee shall receive up to 16 hours of personnel time off per year with no questions asked. If management approves additional personal time off requested by the employee, the employee shall be required to use his or her banked vacation. PTO will be in 1 hour increments."

2. Modify Section III, Work Week; D.2 to:
   - Change 48 hour notice to 24 hour notice,
   - Delete in the second sentence all text after the word "given".

3. Modify Section VI Assignment of Overtime Work,
   - B.2.a. change from 2 hours notice to ½ hour notice.
   - C.3. delete "in the Operations Department."
   - C.4. change to read "The overtime equalization list will be followed in the maintenance department and all refusals properly recorded."
   - C.5. delete "Such overtime assignment will be in the employee's normal area of activity."
   - C.5. delete everything after "…hours of overtime lost,"

4. The Company and the Union agree to meet and discuss within 6 months Drug Testing on post industrial accidents.

5. Modify Section XXV – Refining Operations to :
   - Replace B with: "The management reserves the right to schedule the work of all departments and sections throughout the Refinery. Nothing herein contained shall be interpreted to prevent the Company from operating in accordance with the normal practice of the Company, and the Company shall exclusively have the right to determine the extent to which its plant or departments (in whole or in part), shall be operated, suspended, shutdown or changed, or production reduced or increased. Both parties further agree that nothing in this contract shall hinder the efficient operations of the plant.

Except as otherwise limited by specific provisions this agreement, the management of the Refinery shall be vested exclusively in the Company, including but not limited to the direction of the working forces; the right to hire; the right to suspend or discharge employees for just cause; the right to relieve employees from duty because of lack of work or other reasonable cause; the right to set shift schedules; and the right to transfer employees from one area of the (~~Refinery~~) **department** or duty to another."

- Replace C with: "The Employer will make every effort to operate the refinery continuously on a year round basis.  In order to do so the Employer will, when necessary: (1) reduce the melt to the lowest level it deems economically feasible to avoid canceling regularly scheduled operating days; or (2) shut down for a period of not less than one or more full work weeks. In the event the Employer believes that canceling regularly scheduled operating days of less than one or more full weeks is required, it shall first consult with the Union. In case of such shutdown, employees will be laid of and called back as station and department conditions require and according to (~~past practice~~) **Section XIV**."

- Delete Section XXV, D.
- Delete Section XXV, E.

6. Modify Section XII Vacations to create a new vacation schedule. These changes are for employees hired after the date of ratification.
   - Section XII; A#2a. Delete
   - Section XII. A#2d: change to read as follows: "For those with 15 years or more of continuous service, twenty (20) work days off with pay."
   - Section XII. A#2e. Delete

   Current employees hired prior to date of ratification will keep the current schedule.

7. Modify Section XII; B.2. to "Banked vacation may be taken in one (1) hour increments in accordance with Section XII;B.4.a."

8. Modify Section XII; B.4.a. to "Banked vacation can be taken at a mutually agreeable time in 1-hour to 5-day increments."

9. The Company will notify the Union of employees placed on special assignment and the estimated duration of the assignment.

10. The Company will agree to meet and discuss with the Union, payroll issues, if any, 60 days after the installation and implementation of the new clock-in stations.

11. The Company and the Union agree to meet and open discussions within 6 months of ratification of an agreement on a modification of the existing "Advancement Program."

12. Delete all references to Security in the CBA, including Section XIV C.3.d Position in the Outpost shall be modified to eliminate Security position and renamed as "Truck Checker." Apply CBA to determine eligibility and movement of former Security into Truck Checker or other positions. Grandfather current guards at current levels as they move into Truck Checker or other positions under the CBA.

13. Modify Section XXI Strikes, Lockouts and Work Stoppage to read :
   A. There shall be no strike, sympathy strike, lockout or work stoppage for the life of the contract.
   B. Collusive picket lines, jurisdictional picket lines, and demonstration picket lines, regardless of the union by which any such line is established, are not legitimate picket lines within the meaning of this agreement. Nothing in this section is intended to restrict employee's N.L.R.A. Section 7 rights to engage in lawful informational picketing during their non-working time, so long as such informational picketing does not cause others to engage in a strike, sympathy strike nor other work stoppage.
   C. The Union will give the Employer seventy-two (72) hours' notice in writing of its intention to recognize a legitimate picket line in order to permit the Employer to safely terminate operations and sweeten off its plant."

## III. LANGUAGE CLEAN-UP

1. Modify Section V Premium Pay to :
   - B.1.e. – delete last paragraph: Whenever a Millwright Electrician (shift) performs work on a day of rest, the normal quitting time will be the same as the quitting time on a regularly scheduled day of work, except when assigned to work in Construction or on plant order work. (in which cases the shift would be eight and one-half (8-1/2) hours elapsed time).
   - B.2. – delete
   - B.3. - delete

2. Modify Section XIII Funeral Leave by deleting "and does not apply to death resulting from earthquake or war."

3. Modify Section II Wages, by deleting #5 (cost of living allowance).

4. Modify Section XIV Employment, Advancement and Retention
   - E.2. – delete a. and b. in their entirety and add language: "Bargaining unit employees promoted to a supervisory position lose all rights to return to the bargaining unit and all seniority after 90 days."
   - E.3.c – delete in its entirety.

5. Modify Section XX Grievance procedure
   - Change all references of Director – Personnel and Industrial Relations to Manager of Human Resources.

6.  Except as otherwise expressly provided for in this agreement, all amendments or changes provided for herein shall be made effective June 1, 2006.

In witness whereof, the parties hereto have executed this settlement agreement effective June 1, 2006.

C&H SUGAR COMPANY, INC.                     SUGAR WORKERS UNION NO 1,
                                            S.I.U.N.A.

_____                   _____
Robert M. Jandovitz                         Jens Aagaard

_____                   _____
Kyle Stradleigh                             Surinder Bhanot

                                            _____
                                            Cory Wilson

                                            _____
                                            Mohinder Nahal

                                            _____
                                            Larry Williams

                                            _____
                                            Kevin Abel

                                            _____
                                            Robert Jarvis
                                            STEVEN STACKLEU

1   WILL M. YAMADA, ESQ. (SBN 226669)
    KATHLEEN N. MASTAGNI, ESQ. (SBN 244298)
2   MASTAGNI, HOLSTEDT, AMICK,
    MILLER, JOHNSEN & UHRHAMMER
3   A Professional Corporation
    1912 I Street
4   Sacramento, California 95814
    Telephone:    (916) 446-4692
5   Facsimile:    (916) 447-4614

6   Attorney for Petitioner
    Sugar Workers Union Local No. 1

7

8                   SUPERIOR COURT OF CALIFORNIA

9                     COUNTY OF CONTRA COSTA

10

11  SUGAR WORKERS UNION LOCAL        )   No.
    NO. 1,                           )
12                                   )
                Petitioner,          )
13                                   )   DECLARATION OF JENS AAGAARD
                                     )   IN SUPPORT OF PETITION TO
14  C & H SUGAR COMPANY,             )   COMPEL ARBITRATION
                                     )
15              Respondent.          )
                                     )
16                                   )
                                     )
17                                   )
                                     )
18  _____ )

19

20  1.    My name is Jens Aagaard. My current work address is 830 Loring Avenue. My work

21        telephone number is (510) 787-3400. I am currently employed by C&H Sugar Company

22        and I am member of Sugar Workers Union Local #1. I served as the President of the

23        Sugar Workers Union from on or about October 28, 2005 until late October of 2006.

24  2.    On or October 10 2006, I learned that C&H had terminated Robert Tim Shelton. As a

25        representative of the union, I began the grievance process on behalf of Shelton.

26  3.    On or about October 17, 2006 I spoke with Shelton's supervisor Mike Mason about his

27        termination. Mason told me there was nothing he could do to change the decision.

28  4.    On or about October 19, 2006 I also spoke with Shelton's other supervisor George

          Zhering regarding the termination.

5.    On or about October 19, 2006 a written grievance was prepared on behalf of Shelton. In the grievance the union asserted that he was unfairly terminated and asked that he be reinstated to work.

6.    In late October of 2006 I attended a grievance meeting with Lawrence Ross, Shelton and Kyle Stradleigh. During this meeting Shelton was given the opportunity to go over the facts leading up to his termination. Stradleigh said he would take this consideration and needed to speak with other managers before deciding whether they would change their decision. During this meeting Stradleigh did not raise any issues about untimeliness of the grievance.

7.    In late October of 2006, I learned that Franklin Wright had been sent home from work indefinitely. After speaking with Wright I spoke with Stradleigh about setting about a grievance meeting over his discipline.

8.    On or about October 23, 2006, I attended a meeting with Lawrence Ross, Franklin Wright and Kyle Stradleigh regarding Wright's indefinite suspension. We met with Stradleigh to discuss Wright's case. Stradleigh told us he had not yet decided what he was going to do.

9.    After the meeting, a written grievance was prepared for Wright in case the company decided to terminate him.

10.    In or about late October of 2006, I resigned my position as President of the union. I am unaware of what occurred in these grievances after I resigned as president of the union.

   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief and if called to testify, I could and would do so competently. Signed in ___Crockett___, CA.

DATED: March 22, 2007

_____
Jens Aagaard

1  WILL M. YAMADA, ESQ. (SBN 226669)
   KATHLEEN N. MASTAGNI, ESQ. (SBN 244298)
2  MASTAGNI, HOLSTEDT, AMICK,
   MILLER, JOHNSEN & UHRHAMMER
3  *A Professional Corporation*
   1912 I Street
4  Sacramento, California 95814
   Telephone:    (916) 446-4692
5  Facsimile:    (916) 447-4614

6  Attorney for Petitioner
   Sugar Workers Union Local No. 1
7

8              SUPERIOR COURT OF CALIFORNIA

9                COUNTY OF CONTRA COSTA

10

11 SUGAR WORKERS UNION LOCAL      )
   NO. 1,                         )
12                                )
              Petitioner,         )
13                                )   DECLARATION OF LAWRENCE
                                  )   ROSS IN SUPPORT OF PETITION
14                                )   TO COMPEL ARBITRATION
   C & H SUGAR COMPANY,           )
15                                )
              Respondent.         )
16                                )
                                  )
17                                )
                                  )
18 _____)

19

20 1.   My name is Lawrence Ross. My current work address is 641 Loring Avenue. My

21      telephone number is (510) 787-1676. I am currently the Sugar Workers Union Local #1

22      business agent. I am responsible for representing sugar worker members in grievances

        with C&H. I became the business representative on or about October 25 2006.
23
   2.   When I first became the business agent, I was working with the then union president, Jens
24
        Aagaard to be apprised of all the current cases. Jens told me that there was a pending
25
        grievance for the termination of Robert T Shelton. A copy of the written grievance is
26
        attached to this declaration as Exhibit 1.
27
   3.   In late October of 2006, I attended a grievance meeting with Jens Aagaard, Robert Tim
28
        Shelton, and Kyle Stradleigh the human resources director to discuss Shelton's

1  termination. Shelton was given the opportunity to explain the circumstances leading up

2  to his termination. We asked Stradleigh to reconsider the termination of Shelton.

3  Stradleigh told us he would have to talk to the other managers and he would let us know.

4  4.    In late October of 2006, I attended a meeting with Jens Aagaard, Franklin Wright and

5  Stradleigh regarding Wright's indefinite suspension. Wright had recently been suspended

6  and C&H had not indicated what they planned to do with Wright. We met with

7  Stradleigh to discuss Wright's case. Stradleigh told us he had not yet decided what he

8  was going to do.

9  5.    On October 31, 2006 I learned that the company had terminated Wright despite our

10  grievance meeting. On November 1, 2006 I filed a written grievance that had been

11  prepared on behalf of Wright. A copy of this grievance is attached to this declaration as

12  Exhibit 2.

13  6.    On several occasions in early November of 2006, I met with Stradleigh the C&H human

14  resources director to discuss pending grievances. During these discussions, I specifically

15  asked him to provide me copies of Wright and Shelton's file in conjunction with their

16  grievances. He told me he was in the process of obtaining full copies of the files.

17  7..    A few days after I asked for Wright and Shelton's file I again asked Stradleigh when I can

18  expect to receive the files. Stradleigh then told me he needed written authorization from

19  both grievants before he would turn over the personnel files. I obtained written

20  authorization from both grievants and provided a copy to Stradleigh.

21  8.    After I provided Stradleigh copies of the written authorizations, he told me he would

22  provide me copies of the personnel files shortly.

23  9.    When Stradleigh failed to provide the personnel files as he had agreed to, I sent him a

24  letter dated December 14, 2006. In this letter I again asked for the personnel files in

25  connection with their grievances.

26  10.    On or about December 18, 2006 I received a letter from Stradleigh where he claimed he

27  was unaware of any grievances for Wright and Shelton. I was surprised to read this letter

28  since I had personally spoken with Stradleigh about these cases on several occasions.

Stradleigh never indicated that he was unaware of any pending grievances. Throughout

1    November he repeatedly promised to provide copies of the personnel files in conjunction

2    with their grievances.

3  11.  On or about December 21, 2006 I sent a letter to Stradleigh again requesting the

4    personnel files. I also sent Stradleigh a copy of the two written grievances that had

5    previously been filed on behalf of Wright and Shelton by the union.

6  12.  After not receiving a response from Stradleigh for more than a week, I had no choice but

7    to have charges filed against C&H for refusing to provide the personnel files.

8  13.  Finally at the end of January 2007, Stradleigh provided me copies of Shelton and

9    Wright's personnel file. When I reviewed the files, I realized that it did not include the

10    investigations that led to the grievants' terminations. Accordingly, I sent Stradleigh two

11    letters on February 15, 2007 to obtain copies of any investigations done in Wright and

12    Shelton's cases and to confirm there were no other documents. I needed this information

13    to fully represent the members in their grievances.

14  14.  On or about February 23, 2007, Stradleigh responded to my letter refusing to provide the

15    investigations and again claiming there were no grievances pending.

16  15.  On February 28, 2007 I sent Stradleigh a letter demanding arbitration of Wright's

17    grievance.

18  16.  On March 1, 2007 Stradleigh sent the union a letter refusing to arbitrate Wright's case.

19  17.  On March 1, 2007 I personally spoke with Stradleigh about Shelton's grievance and

20    demanded that we select an arbitrator to take his case to arbitration. Stradleigh refused to

21    select an arbitrator and refused to arbitrate Shelton's case.

22  18.  Throughout these grievances, the union has made every effort to comply with the

23    grievance procedure. Stradleigh has continually delayed and obstructed the processing of

24    these grievances.

25    I declare under penalty of perjury under the laws of the State of California that the

26  foregoing is true and correct to the best of my knowledge and belief and if called to testify, I

27  could and would do so competently. Signed in __Crockett__, CA.

28  DATED: March _23_, 2007

                                   Lawrence Ross

C-1

 **SUGAR WORKERS UNION LOCAL**  641 Loring Avenue
P. O. Box 583
Crockett, CA 94525
(510) 787-1676
(510) 787-2788
FAX (510) 787-1676 

To:     Kyle Stradleigh
From:   Jens Aagaard
Date:   October 19, 2006
Re:     Grievance, Unfair termination of Tim Shelton

Dear Mr. Stradleigh,

On or about October 10, 2006 the union learned that C&H unfairly terminated Tim Shelton. On or about October 17, 2006 I spoke with Tim's immediate supervisor Mike Mason regarding the termination. Mason told me that there is nothing he can do and that it is in Human Resources' hands.

On October 19, 2006 I met with Tim's other supervisor George Zhering and Jim Dudley, the plant manager regarding Tim's termination. The also told me that they could not do anything to reinstate Tim.

This serves as a formal written grievance for the unfair termination of Tim Shelton.

Remedy Requested

Reinstate Tim to his work.



**SUGAR WORKERS UNION LOCAL** # **1**

641 Loring Avenue
P. O. Box 583
Crockett, CA 94525
(510) 787-1676
(510) 787-2788
FAX (510) 787-1676



TO:     Kyle Stradleigh
From:   Jens Aagaard
Date:   November 1, 2006
Re:     Grievance, Unfair discharge Franklin Wright Jr.

Dear Mr. Stradleigh,

On Tuesday, October 31, 2006 the union learned that C&H terminated Franklin Wright Jr. The union is grieving this unfair termination.

On Monday, October 23, 2006 Frank and I had a meeting with you to discuss Frank's case. Accordingly, this letter serves as a formal grievance of Franklin Wright's termination.

Remedy Requested

Reinstate Franklin Wright Jr. to his work and pay him back for days lost.

11-8-06

I Do hereby Grant To SWU Local Union #1 the wright to receive a copy of my personel file.

Robert T. Shelton
#75384

FAX # 1-015-787-1776

11-22-06

I, Franklin Waugh
Hereby grant permission
to www. Iread #1 to my
personal files in all their
entirety.

Franklin Waugh



**SUGAR
WORKERS
UNION
LOCAL**

# #1

641 Loring Avenue
P. O. Box 583
Crockett, CA 94525
(510) 787-1676
(510) 787-2788
FAX (510) 787-1676



To:     Kyle Stradleigh
From:   Lawrence Ross
Date:   December 14, 2006
Re:     Release of Union members Records


Dear Mr. Stradleigh,

    Due to the Grievance's filed by the Union for the unfair terminations of Sarah Orullion , Tim Shelton, and Franklin Wright Jr. The Union is still awaiting the release by the Company of the three said employee's personal records to the Union since the request were made on November 8, 2006 by Tim Shelton , November 20, 2006 by Sarah Orullion , and November 22, 2006 by Franklin Wright Jr.


    Please feel free to contact me at your earliest convenience.


Respectfully,

Lawrence Ross
SWU #1
Business Agent



**C&H SUGAR COMPANY, INC.**

**MEMORANDUM**
Human Resources

Kyle C. Stradleigh
Human Resources
Manager

830 Loring Ave
Crockett, CA 94525
www.chsugar.com

TO:        Lawrence Ross, Business Agent, SWU #1

FROM:      Kyle Stradleigh

DATE:      December 18, 2006

SUBJECT:   Re: Release of Union members records (12/14/2006)

CC:        File
           Dept. Mgr.

I received your memo requesting the personnel files for Sarah Orullion, Tim Shelton, and Franklin Wright Jr. due to "...grievance's filed by the Union for the unfair discharge...".

However, please be advised that the Company is not in possession of any grievance filed by the union on behalf of these former employees. In addition, due to the time limitations set forth in the CBA, we will be unable to accept any grievances on behalf of these individuals.



**SUGAR
WORKERS
UNION
LOCAL**

**#1**

641 Loring Avenue
P. O. Box 583
Crockett, CA 94525
(510) 787-1676
(510) 787-2788
FAX (510) 787-1676



To:    Kyle Stradleigh
From:  Lawrence Ross
Date:  December 21, 2006
Re:    Continuing Grievance Terminations

As you may recall since the termination of Franklin Wright Jr. On many separate occasions I have asked specifically for the records of Sarah Orullion, Tim Shelton, and Franklin Wright Jr. in order to represent there grievance's appropriately due to the Company stating the three employee's past history as a factor in the Companies final decision.

Upon the first request you stated that you can do that. Upon the second request you stated that you would need a signed statement from the employee's in question in order to release there personal records. Upon receiving there signed statements you then mentioned that the signed statements were only necessary if the Union were asking for there medical records, therefore the statements were not needed and that you would take care of it.

Finally after receiving no response from the Company, the Union was forced to request the files in writing. Now the Union is to understand that the Company has somehow lost or misplaced the grievance's. Well it's your lucky day since the Union still has those Grievance's on file which I will attach copies to this one. In addition, the time delay is not due to the Union for which we are still (ONCE AGAIN) awaiting the release of the said individuals files due to the grievance's filed by the Union.

P.S. - Try not to lose these . . .

I



INTERNET
FORM NLRB-501
(11-94)

FORM EXEMPT UNDER 44 U.S.C. 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case 32-CA-22991 | Date Filed 1-4-2007 |

**INSTRUCTIONS:**
**File an original and 4 copies of this charge with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.**

| 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT | | |
|---|---|---|
| a. Name of Employer C & H Sugar Company, Inc. | | b. Number of Workers Employed ~350 |
| c. Address (street, city, State, ZIP, Code) 830 Loring Ave. Crockett, CA 94525 | d. Employer Representative Kyle C. Stradleigh | e. Telephone No. (510) 787-4217 |
| | | Fax No. |
| f. Type of Establishment (factory, mine, wholesaler, etc.) Factory | g. Identify Principal Product or Service Sugar Production | |

h. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of Section 8(a), subsections (1) and (list subsections) 8(a)(5) of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices.)

Within the last six months the employer has refused the Union's information requests regarding three members that were employed by C & H Sugar Company. The three individuals: Sarah Orullian, Frank Wright and Tom Shelton were terminated by C &H. The Union has requested their personnel files in order to provide them representation and to investigate the terminations.

The employer has repeatedly ignored and refused to comply with these information requests.

RECEIVED NLRB REGION 32
2007 JAN -4 PM 12: 08
OAKLAND, CA

COPY SENT NLRB
Date 1-5-07 By BJ

By the above and other acts, the above-named employer has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act.

| 3. Full name of party filing charge (if labor organization, give full name, including local name and number) | | |
|---|---|---|
| Sugarworkers Union Local No. 1 | | |
| 4a. Address (street and number, city, State, and ZIP Code) 641 Loring Ave. Crockett, CA 94525 | 4b. Telephone No. (510) 787-1676 | |
| | Fax No. (510) 787-1776 | |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization)

Seafarers International Union of North America, AFL-CIO

| 6. DECLARATION | |
|---|---|
| I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief. | |
| By (Signature of representative or person making charge) | Kathleen N. Mastagni, Attorneys at Law (Title, if any) |
| Address 1912 I Street, Sacramento, CA 95814 | Fax No. (510) 787-1776 (916) 446-4692 (Telephone No.)     January 2, 2007 Date |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**



**SUGAR WORKERS UNION LOCAL**

**#1**

641 Loring Avenue
P.O. Box 583
Crockett, CA 94525
(510) 787-1676
(510) 787-2788
FAX (510) 787-1776





To: Kyle Stradleigh, C&H Human Resources Manager

From: Lawrence Ross, Business Agent, SWU #1

Date: February 15, 2007

Re:    Frank Wright

On January 31, 2007 the company provided the union with what was purported to be a complete copy of Wright's personnel file. It is important to note that this file appears to be missing documents. There is a record dates 6/3/ 2003. The next document in his file is the termination letter.

Please confirm that the file provided to the union was complete. If we do not receive a response from you by February 22, 2007, we will assume the file provided was complete.

Please also provide a complete copy of the investigation conducted leading to the termination of Wright. This includes but is not limited to notes, written statements, notes of statements etc. This information is necessary and relevant to fully represent Wright in his termination. Provide this to us by the end of the day on Tuesday February 22, 2007. If you fail to provide the documentation we will file new charges with the NLRB.



**SUGAR
WORKERS
UNION
LOCAL**

**#1**

641 Loring Avenue
P.O. Box 583
Crockett, CA 94525
(510) 787-1676
(510) 787-2788
FAX (510) 787-1776



To: Kyle Stradleigh, C&H Human Resources Manager

From: Lawrence Ross, Business Agent, SWU #1

Date: February 15, 2007

Re:    Tim Shelton

On January 31, 2007 the company provided the union with what was purported to be a complete copy of Shelton's personnel file. It is important to note that this file appears to be missing documents. There is a record dates 9/9/ 2004. The next document in his file is the termination letter.

Please confirm that the file provided to the union was complete. If we do not receive a response from you by February 23, 2007, we will assume the file provided was complete.

In addition, please provide the union with a complete copy of the investigation used to terminate Shelton. This includes but is not limited to notes, interviews, witness statements, etc. This information is needed to fully represent Mr. Shelton in his termination grievance.

Feb. 23. 2007  7:03PM                                    NO. 0003    P. 1/1

**MEMORANDUM**
Human Resources

 **C&H SUGAR COMPANY, INC.**

Kyle C. Stradleigh
Human Resources
Manager

830 Loring Ave
Crockett, CA 94525
www.chsugar.com

TO:        Lawrence Ross, Business Agent, SWU #1

FROM:      Kyle Stradleigh

DATE:      February 23, 2007

SUBJECT:   Re: Tim Shelton

CC:        File

It is the Company's position that the copy of Tim Shelton's personnel file provided to you is a complete copy. If additional information is located, the Company will provide copies to you.

Additionally, your memo dated February 15, 2007, requesting investigation information implies there is an active termination grievance.

Please be advised that the Company is not in possession of an active grievance regarding this issue. Any grievance previously filed on this issue is considered inactive and time barred from the grievance process, per Section XX of the CBA.

As such, the Company does not recognize your assertion of an active grievance regarding Tim Shelton's termination.

FEB-24-2007 08:53A FROM: SWU#.        15107871776                    P.10/11
Feb. 23. 2007  7:18PM                          164474614     No. 0665   P. 1/1

**C&H SUGAR COMPANY, INC.**

**MEMORANDUM**
Human Resources

Kyle C. Stradleigh
Human Resources
Manager

830 Loring Ave
Crockett, CA 94525
www.chsugar.com

TO:        Lawrence Ross, Business Agent, SWU #1

FROM:      Kyle Stradleigh

DATE:      February 23, 2007

SUBJECT:   Re: Franklin Wright

CC:        File

It is the Company's position that the copy of Franklin Wright's personnel file provided to you is a complete copy. If additional information is located, the Company will provide copies to you.

In your memo dated February 15, 2007, you request a copy of the investigation conducted by the Company. The Company is unable to provide a copy of this information to you as requested. The information you have requested is associated with a confidential internal investigation, which we will not release at this time.

Additionally, your memo threatens to file a ULP charge with the NLRB if the Company does not adhere to your request. Please be advised that the Company does not respond to threats and views your statement as nothing more than a feeble attempt to harass, threaten and intimidate the Company. If it is you intent to file charges with the NLRB, then do so as a procedural right afforded to you, but refrain from advertising this in a form of a threat, attempting to utilize the NLRB as a bargaining chip for something amounting to nothing more than "quid pro quo"



**SUGAR WORKERS UNION LOCAL** **#1**



641 Loring Avenue
P.O. Box 583
Crockett, CA 94525
· (510) 787-1676
(510) 787-2788
FAX (510) 787-1776



To:    Kyle Stradleigh
From: Lawrence Ross
Date:  February 28, 2007
Re:    Notice of Appeal
       Franklin Wright Jr.

Dear Mr. Stradleigh,

      In responding to the Union's request for Franklin Wright's personnel file there appears to be certain words which you use out of text such as complete. The definition states "Having all necessary parts". The investigation conducted by the Company about Mr. Wright is part of his personnel file and thus is not to be excluded from a confidential file to begin with nor is the file submitted to the Union complete. This unwillingness by the Company to comply with giving all information to the Union, "not to mention the order from the NLRB" is nothing more then "how did you put it" a feeble attempt by the Company to stop the light of justice from shinning on Mr. Wright.

      It is the Union's intent to expose the truth concerning Mr. Wright's case. If in so doing the Company feels harasses, threatened, or intimidated then so be it. We have no control over how you feel. After all, you were not the ones unjustly terminated. If the Company will not act in good faith then the Union has no recourse except to substitute or "quid pro quo" with the NLRB.

      Since your willingness to" cloud the issue, misdirect the true focus, and withhold evidence" The Union is demanding Arbitration for the return of Franklin Wright Jr. and all wages lost thereof.

MEMORANDUM
Human Resources

**C&H** | C&H SUGAR COMPANY, INC.

Kyle C. Stradleigh
Human Resources
Manager

TO:          <u>Lawrence Ross, Business Agent, SWU #1</u>

830 Loring Ave
Crockett, CA 94525
www.chsugar.com

FROM:       Kyle Stradleigh

DATE:        March 1, 2007

SUBJECT:     Re: Franklin Wright

CC:           File


The Company received your memo regarding the referenced subject on February 28, 2007.

Please refer to the Company's response, dated January 2, 2007 where you were informed that your grievance was untimely.

Additionally, you recent demand for Arbitration, dated February 28, 2007 is untimely.

The Company is unable to recognize your demand for arbitration.

**PROOF OF SERVICE**

SHORT TITLE OF CASE: *Sugar Workers Union Local No. 1 v. C&H Sugar Company*

CASE NUMBER:          N07-0250 (Contra Costa County Superior Court)

I am a citizen of the United States and a resident of the County of Sacramento. I am over the age of eighteen years and not a party to the above-entitled action; my business address is 1912 I Street, Sacramento, California 95814.

On the date below, I served the following document(s):

- **1. CIVIL CASE COVER SHEET;**
- **2. NOTICE OF HEARING ON PETITION TO COMPEL ARBITRATION;**
- **3. PETITION TO COMPEL ARBITRATION**
- **4. MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION TO COMPEL ARBITRATION**
- **5. [PROPOSED] ORDER TO COMPEL ARBITRATION**
- **6. DECLARATION OF WILL M. YAMADA IN SUPPORT OF PETITION TO COMPEL ARBITRATION**

addressed as follows:

Kyle Stradleigh
Human Resources Manager
C&H SUGAR COMPANY
830 Loring Avenue
Crockett, CA 94525

_____    **BY MAIL.  I caused such envelope, with postage thereon fully prepaid to be placed in the United States Mail at Sacramento, California.**

__XX__    **BY PERSONAL SERVICE.  I caused such envelope to be delivered by hand to the offices of the person(s) listed above.**

_____    **BY FACSIMILE TRANSMISSION.  I transmitted such document(s) by facsimile machine to the telephone number listed above.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **May 14, 2007**, at Sacramento, California.

_____
Pamela Estep

MASTAGNI, HOLSTEDT, AMICK,
MILLER, JOHNSEN & UHRHAMMER
A PROFESSIONAL CORPORATION
1912 I STREET
SACRAMENTO, CALIFORNIA 95814

Welcome to Contra Costa County Superior Court                                           Page 1 of 1



## When are my next court dates?

### SUGAR WORKERS VS C&H SUGAR
### MSN07-0250

| Date/Time | Description | Location |
|-----------|-------------|----------|
| 06/08/2007 8:30 AM | HEARING ON COMPEL ARBITRATION ( SUGAR WORKERS UNION LOCAL NO 1) | ROOM 312, Department 16 725 COURT STREET MARTINEZ |

